E-filing

## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name _Oldham_ _Robert_ _L_
(Last)        (First)        (Initial)

Prisoner Number _F06175_

Institutional Address _P.O. Box 3030, CSP High Des_
_-ert, Susanville, Ca 96127, C-5 230_

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

_People of the State of California_        )
(Enter the full name of plaintiff in this action.)    )
                                                       )
            vs.                                        )
                                                       )
_Robert Oldham, Jr_                                    )
_____                            )
_____                            )
_____                            )
_____                            )
(Enter the full name of respondent(s) or jailer in this action)  )
_____                            )

CV 08 No. _14_ 2340 VRW
(To be provided by the clerk of court)

**PETITION FOR A WRIT
OF HABEAS CORPUS**        (PR)

Case No. _14_

==========================================================

### Read Comments Carefully Before Filling In

#### When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these

counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

this district if you are challenging the manner in which your sentence is being executed, such as loss of

good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

one of the above-named fifteen counties, your petition will likely be transferred to the United States

District Court for the district in which the state court that convicted and sentenced you is located. If

you are challenging the execution of your sentence and you are not in prison in one of these counties,

your petition will likely be transferred to the district court for the district that includes the institution

where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS          - 1 -

1  <u>Who to Name as Respondent</u>

2        You must name the person in whose actual custody you are.  This usually means the Warden or

3  jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5  respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  <u>A.  INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11        1.  What sentence are you challenging in this petition?

12        (a)    Name and location of court that imposed sentence (for example; Alameda

13               County Superior Court, Oakland):

14        <u>Alameda County Superior court</u>      <u>Oakland</u>

15               Court                              Location

16        (b)    Case number, if known  <u>144476</u>

17        (c)    Date and terms of sentence  <u>50 years to life</u>

18        (d)    Are you now in custody serving this term?  (Custody means being in jail, on

19               parole or probation, etc.)        Yes <u>✓</u>    No ____

20               Where?

21               Name of Institution: <u>High Desert State Prison</u>

22               Address: <u>P.O. Box 3030, Susanville, Ca 96127</u>

23        2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  <u>First Degree Murder (Pen. Code 187) Possesion of a firearm by a felon (pen.code</u>

27  <u>12021 subd (a)(1), 12022.5 subd (a)(1) 12022.53 subd (c) 12022.53</u>

28  <u>subd (d)</u>

3. Did you have any of the following?

    Arraignment:                         Yes __✓__    No _____

    Preliminary Hearing:              Yes __✓__    No _____

    Motion to Suppress:             Yes __✓__    No _____

4. How did you plead?

    Guilty _____    Not Guilty __✓__    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury __✓__    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?           Yes __✓__    No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment                Yes __✓__    No _____

    (b)    Preliminary hearing        Yes __✓__    No _____

    (c)    Time of plea              Yes __✓__    No _____

    (d)    Trial                      Yes __✓__    No _____

    (e)    Sentencing               Yes __✓__    No _____

    (f)    Appeal                   Yes __✓__    No _____

    (g)    Other post-conviction proceeding    Yes _____    No __✓__

8. Did you appeal your conviction?        Yes __✓__    No _____

    (a)    If you did, to what court(s) did you appeal?

            Court of Appeal          Yes __✓__    No _____

            Year: _2005_    Result: _Petition for review denied_

            Supreme Court of California    Yes __✓__    No _____

            Year: _2007_    Result: _Petition for review denied_

            Any other court          Yes _____    No _____

            Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS       - 3 -

1          petition?                 Yes ✓      No_____

2       (c)    Was there an opinion?          Yes ✓      No_____

3       (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                               Yes _____    No ✓

5             If you did, give the name of the court and the result:

6             _____

7             _____

8 9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9 this conviction in any court, state or federal?             Yes _____    No ✓

10        [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11 challenged the same conviction you are challenging now and if that petition was denied or dismissed

12 with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13 for an order authorizing the district court to consider this petition. You may not file a second or

14 subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15 U.S.C. §§ 2244(b).]

16      (a)     If you sought relief in any proceeding other than an appeal, answer the following

17             questions for each proceeding. Attach extra paper if you need more space.

18           I.     Name of Court: _____

19                  Type of Proceeding: _____

20                  Grounds raised (Be brief but specific):

21                         a._____

22                         b._____

23                         c._____

24                         d._____

25                  Result: _____ Date of Result:_____

26           II.     Name of Court: _____

27                  Type of Proceeding: _____

28                  Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS      - 4 -

1        a._____

2        b._____

3        c._____

4        d._____

5        Result: _____Date of Result:_____

6     III.   Name of Court: _____

7        Type of Proceeding: _____

8        Grounds raised (Be brief but specific):

9        a._____

10       b._____

11       c._____

12       d._____

13       Result: _____Date of Result:_____

14    IV.   Name of Court: _____

15       Type of Proceeding: _____

16       Grounds raised (Be brief but specific):

17       a._____

18       b._____

19       c._____

20       d._____

21       Result: _____Date of Result:_____

22   (b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                              Yes _____    No_____

24     Name and location of court: _____

25  B. GROUNDS FOR RELIEF

26     State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27  support each claim.  For example, what legal right or privilege were you denied?  What happened?

28  Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

1    need more space. Answer the same questions for each claim.

2    [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5    Claim One: _Admission of appellants statements into evidence violated his 5th_

6    _and 5th amendments because they were coerced._

7    Supporting Facts: _After being assulted by an interrogating officer and hospitalized,_

8    _appellant was requestioned and forced to make involuntary statements after_

9    _the interrogating officers promised and fulfilled Oldhams wish to see his_

10   _girlfriend._

11   Claim Two: _A deputy sherrif was a key prosecution witness and in charge of_

12   _the jury, violating appellants 14th and 5th amendment to trial by an impartial jury._

13   Supporting Facts: _Deputy Sherrif Ortman was the bailiff to the jury and a key_

14   _prosecution witness as well.(Gonzales V. Beto (1972) 405 U.S. 1052)viol_

15   _ating Oldham's right to trial by an impartial jury._

16

17   Claim Three: _Conviction for 1st Degree murder must be reduced to second Degree_

18   _murder because of lack of premeditation and deliberation proof._

19   Supporting Facts: _Here the evidence does not meet the standards of California Law_

20   _for showing premeditation and deliberation, because there is no evidence of_

21   _motive and no evidence of planning activity, careful thought, or preconcieved_

22   _design_

23   If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1     List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4    (People V. Anderson, supra, 70 cal. 2d at p.23)(Dickerson V. United States (2000) 530 U.S.

5    428)(Id; People V. Neal (2003) 31 Cal. 4th 63, 79)(Miranda V. Arizona (1966) 384 U.S.

6    436)(Gonzales V. Beto, supra 405 U.S. 1052, 1053)

7    Do you have an attorney for this petition?                Yes____   No ✓

8    If you do, give the name and address of your attorney:

9    _____

10     WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on _April 29, 2008_           Robert Oldham

14                Date                    Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS     - 7 -

"Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus."

"Conform Copy "

By. Robert Oldham (Petitioner)

Constitutional Bases                    Case # 144476

① 6 $^{th}$ Amendment; In all criminal prosecutions, the accused
shall enjoy the right to a speedy and public trial by an impartial
jury of the state and district wherein the crime shall have been commi
-tted, which district shall have been previously ascertained by law
and to be informed of the nature and cause of the accusation to be
confronted with the witnesses against him, to have compulsory process
for obtaining witnesses in his favor and to have the assistance
of counsel for his defense. (Proposed September 25, 1789 ratified
December 15, 1791)

② 14 $^{th}$ Amendment; The Due Process clause of the 14 $^{th}$ amendment
states that the test is whether the information from the defendant
was extracted by any sort of threats, violence, or obtained by
any direct or implied promises, however slighter by exertion of
any improper influence.

Under California Rules of Court, Rule 4.551 (c)(2) I, Robert
Oldham would like to request for Appointment of Counsel and
Declaration of Indigency.

Statement Of The Case

By information appellant was charged with murdering Andrè Ja
-ckson on December 4, 2002. The information also charged
that the murder was committed by personally discharging a
firearm, causing death, and alleged a violation of Penal Code secti
-on 12021 and one prior felony conviction. ( 1 CT 101-103.)
The case was tried to a jury starting on August 22, 2005,
and on September 30, 2005 appellant was convicted of firs-
degree murder and violation of section 12021. The prior wa
found true (2 CT 388 - 389) On December 1, 2005, appell
-ant was sentenced to 25 years to life for the murder
and a consecutive term of 25 years to life for personal
discharge of a firearm, causing death. A two-year term
for violation of section 12021 was stayed pursuant to
Penal Code section 654. (2 CT 410-412.) Appellant
filed timely notice of appeal. (2 CT 443-446.)

①

STATEMENT OF FACTS    (Prosecution Case)

On December 4, 2002, at about six o'clock in the afternoon, police were dispatched to a rundown apartment building in Oakland in response to a 911 call reporting that a man had been shot. (3 RT 461, 466, 471) Arriving at the scene, Officer Nicole Elder was led to a third floor apartment where she found the body of André Jackson. Derrick Miller (Derrick), who was with Jackson, gave a description of the assailant to Officer Elder. (3 RT 475, 476) Elder believed the description fit appellant, Robert Oldham ('Rob'). (3 RT 477) Elder observed several shell casings on the floor, but found no weapons in the room. (3 RT 473, 480)

Derrick had been Jackson's lover for about two years (4 RT 656). That evening, he had returned from his job as a landscape gardener about six o'clock and had seen Rob standing by the apartment building with five other people. (4 RT 671) As Derrick passed by, Rob called out in a sarcastic tone, "Look at that nigga. He got on kneepads." Derrick replied, equally sarcastically, "It's called a job, something you know nothing about." Rob replied, "What you say? I'll beat your ass" (4 RT 671) Derrick ignored Rob and continued on up to Berna Blake's apartment, where he was living. Rob followed him, but Berna stopped Rob at the door and told him to leave. Rob tried to push past Berna to hit Derrick, and Derrick went out into the hallway to confront Rob. They fought, and according to Derrick, he "whooped" Rob. He had Rob by the dreadlocks and was banging his head against the floor. Jackson made them stop. Rob got up, holding his head; he appeared to be dazed. (4 RT 674, 676, 677) Rob left, and Berna-

②

went to the store to get some peroxide and bandages for Derrick's hand, which was bleeding. She told Derrick and Jackson not to let anyone into the apartment while she was gone (3 RT 513; 4 RT 678, 679.)

Derrick went into the bathroom to wash the blood off his hands. While there, he heard Jackson open the front door, and he heard him talking to Rob. This was about five or ten minutes after Berna left. (4RT 732) When Jackson told him Derrick was in the bathroom, Rob said for him to tell Derrick he was a "Mark", and that Rob was going to "get him" (4RT 683.) Then Derrick heard Donté (Donté Lewis) say "No, Rob." Rob said, "I'm not going to do nothing, Dré (André Jackson) is my partner." (4RT 683.) Parish, who was in the bedroom also said he could hear Jackson talking to Rob. Rob asked to speak to Derrick, but Jackson refused to let him in. Derrick was in the bathroom. (3RT 517;) Jackson was being "arrogant and gloating," and talking to Rob in a sarcastic and effeminate voice. (3 RT 515) Still in the bathroom, Derrick then heard "scuffling, followed by gunshots and running footsteps. (4RT 685) He opened the bathroom door and saw Jackson running down the interior hallway to the living room where he fell to the floor and laydown on his back. (4RT 686) Jackson was gasping, trying to breathe (4 RT 687) Derrick called 911 on his cell phone, and described what had happened. He told the 911 operator that Rob had shot Jackson. (4RT 695) From the bedroom Parish (Parish Blake) heard the front door bang open, the sound of someone running down the hallway, and gunshots. These things "all happen

(3)

at once." (3RT 517) Parish initially went to the floor but later changed his story from not seeing anything, to seeing Rob with a gun lowered to his side (3RT 520) Parish heard Dontè saying "come on lets go," and said he heard other voices and saw shadows of other possible suspects, and then Rob and Dontè went down the stairs (3RT 522) Parish refused to tell the 911 operator who he thought had done the shooting. (3 RT 530) When police arrived, he gave a written statement in which he affirmed that he had stayed on the floor and had not looked up, and that he had not seen who did the shooting. (3 RT 536) At the trial, however Parish incu-lpated Rob as summarized above. Dontè Lewis tes-tified he was a friend of Robs (3 RT 589) He said that he witnessed the argument at Berna's apartment, when she refused to let Rob in. After that altercation, he saw Rob leave the apartment building and go toward a red building nearby, on North-gate street. (3 RT 590, 594) Then he saw Rob returning from the direction of the red building (3 RT 598) holding a small pistol, he saw Rob go back up the stairs into the apartment building (3 RT 596) Walking away from the building Dontè heard shots. After the shots he saw Rob and several others running out of the building. (3RT 597, 598) Later on in the month according to Derrick, Dontè threatened him saying he had better keep his mouth shut or he would end up like his bitch." (4RT 707) Berna Blake (Berna) testif-ied that she had seen Rob many times before in the nieghborhood of her apartment. She said that on →

(4)

three previous occasions about a year earlier she had seen him with a gun. (4RT 863, 868) Once, she said, he pulled a gun on a guy in the parking lot of her apartment building. (4RT 870) Another time he started shooting at some guy he did not want to have around. (4 RT 871) Berna said that on the evening of the shooting, Derrick had returned to the apartment upset about Rob making comments about his kneepads, Then Rob came to the door saying that Derrick was not going to disrespect him. (4RT 875) Rob tried to reach into the apartment to get at Derrick. Berna blocked him with a bar, but then D-errick got past her and fought with Rob in the hallw-ay. There were no weapons involved in the fight. (4 RT 876) Derrick got the best of Rob. After the fight broke up, Derrick came back into the apartment a-nd Rob left. Berna went to the store to get medicin-es and soup. (4RT 881) About ten minutes later wh-ile she was out, she saw Rob and Donté getti-ng into a car driven by a woman named Latoya. The three seemed to be in a hurry (4 RT 885-887) Berna testified that, after Rob had been arrest-ed Donté came to her apartment wanting to fight Derrick. (4RT 915) Jackson died of mul-tiple gunshot wounds. (5 RT 1123) When paramedics cut jacksons clothing off during their efforts to res-uscitate him they discovered he had a straight razor strapped to his arm under his shirt (4RT 762-763) A criminalist determined the five shells (casings) found at the scene had all been fired by the same weapon (4RT 816) He also determined that all of the slugs found at the scene were fired from the same weapon (4RT 823

(5)

Rob was arrested on December 23, (5 RT 919) He was in-
terrogated by police. Sergeant Longmiere testified that
there is no legal requirement that officers be truthful
with suspects during interrogation, and frequently
they lie to suspects. Longmiere stated that it was
"safe to say" that he had lied to Rob during the
interrogation in this case by telling him the police
had information and evidence that they did not
really have (6 RT 1255 - 1256) From 2:03 p.m until
5:45 pm Rob consistantly denied any involvement
in the shooting. (5 RT 973 - 978) The interrogators
then took a break, leaving Rob alone in the interr
ogation room. (5 RT 982) When they next checked
on him at 6:12 pm they discovered he had attempt
-ed to kill himself by tying his shoestrings to the
doorknob and hanging himself. (5 RT 986, 993) The
officers entered and removed the shoestring from
Rob's neck. As they opened the door, he fell
to the floor. He was conscious but breathing hard.
He Also had a wound over his left eye, Dunikin
testified he did not know how the wound was
caused.(5 RT 987, 989) The wound ultimately requi
-red four stitches. (5 RT 991) Rob was taken by
ambulance to Highland Hospital and from there
to the John George Pavillion for psychiatric eva
luation. About twelve hours later he was returned
to the police station and interrogations continued.
(5 RT 995) Rob now stated he was familiar
with the building where the shooting had happen
ed, and that he heard ....    cont on p.7

⑥

the shooter was Dontè Lewis ["lil two"] (5 RT 1008) In the past, Rob said, Dontè had bragged that he had "fir -epower" meaning he had ready access to guns. (5 RT 103 ·1) Rob continued to deny that he had actually been present when the shooting occured. (5 RT 1034, 1035) At 9:57 am the interrogators took a break from questioning Rob (5 R 1042) However before any of the questioning of that day took place, Oldham was permitted to see his girlfriend and was told that when he finished cooperating he'd be able to visit with her. When they resumed, bound by the deal to cooperate for the visit Oldham recorded 3 tap -es, saying he was only "back-up" for Lewis and that after lil two fired the shot, he dropped the gun wh -ile running towards Oldham and when Oldham pick -ed up the gun to give it back to him, the faulty safety mechanism of the gun caused it to go off four times. In addition to the above evidence concerning the shooting, the prosecution introduced evidence olled -gedly claiming Rob had threatened the safety off prosecution witness Derrick Miller, who like Rob was now in custody at Santa Rita Jail. The court- -room bailiff, Edward Ortman testified that as a deputy sheriff, he was frequently assigned to handle transportation of inmates from Santa Rita Jail to the courthouse in Oakland for trial, and on the morning preceeding his testimony he had transported Rob and 42 other inmates. (7 RT 1569, 1570) One of the other inmates on the bus → (continue on p.8)

(7)

was Derrick Miller (7 RT 1571) Before the bus left
Santa Rita Jail, Ortman observed Rob pass a
folded piece of paper to an inmate named Engl-
-ish, who was in the compartment behind him.
Miller was contained in the same compartment
as English (7 RT 1572) English unfolded the paper
and quickly looked at it and passed it back. (7 RT
1574) Ortman decided he would remove Miller
from the bus to assure his safety. As Miller was taken
from the bus, Ortman overheard Rob say to Engli-
-sh, "That's him" (7 RT 1575, 1576) Then Ortman pr-
-oceeded to the courthouse with the remaining inmat
-es. After arriving at the courthouse, he retrieved
the paper from Rob, which was a copy of the wit-
-ness list from the jury voir dere packet. Next about
4 names there were arrows drawn pointing at the
names, including Derrick Miller. The prosecutor argued
it was a hit list to stop witness Miller from tes
-tifying. The defense offered testimony in rebuttal
of Ortman's claims of the witness being in danger.
However Ortman did admitt he heard no conversations
pretaining to the witness and that he removed the
witness on his own accord. Rob testified that he
did pass English a copy of the witness list in this ca-
-se, but only to show him that the evidence was
comprised of witnesses and that it was a weak case
based on hearsay. The names highlighted with
arrows were the names of all of the witnesses who
were currently incarcerated, and was done so to
indicate that they should be subjected to additional

(8)   questioning → (continue on 9)

if they decided to testify. There were also some
scribbles next to the names, of which the
prosecution suggested were the $\underline{D}$, $\underline{E}$ and
were probably indignations of the word D.I.E.
Oldham testified they were niether letters
or the word die, merely scribbles to get the
ink in his new pen flowing. ($8$RT $1617$, $1618$)
Defense Case: Dr. John Podboy testified that an
individual who has attempted suicide and then twe
-lve hours later has to interact with others will
have a mental state that is not reliable, and which
he is open to suggestion ($6$ RT $1331-1333$) Such
a person might try to placate those around him,
($6$ RT $1331$) The mere fact that Rob was
cleared by personnel at John George Pavillion
for return to custody would not necessarily
mean that he would give reliable information
because persons suffering from mental illness
can be cleared for custody. ($6$ RT $1354$)
Thus, taking everything into account, one
must seriously question the reliability of st
-atement made by Rob to the police on Dec
-ember 24th, and 23rd during interrogation ($6$ RT
$1362$) Rob testified on his own behalf. He
stated that on December $4$, he left San Fran
-cisco at $5$ o'clock in the afternoon on
BART to visit a foster parent with whom he
had previously lived with in Oakland. ($7$RT $1384$)
At 25th and Telegraph he saw Donté Lewis,
with a group of other people ($7$ RT $1387$, $1388$)
Donté was arguing with Derrick →

(9)

Miller, whom Rob did not know. Miller appeared to be accusing Dontè of involvement in the rob-bery of a friend of his. (7RT 1388) It looked like the confrontation might escalate into a physi-cal fight, so Rob stepped between Derrick and Dontè and pushed them apart to keep them from fighting (7RT 1389) Derrick grabbed Rob to pull him out of the way Rob grabbed back, and they grappled with each other. They fell to the ground wrestling until a lady (Berna) came by and broke it up (7RT 1390) Derrick left with the lady who broke up the fight. Dontè said, "all right, I'm going to get Q." (7RT 1391) Rob was not hurt and harbored no ill feelings toward Derrick because it was his fault for interfering in someone elses buisness. (7RT 1490-1491) He left and spent the rest of the evenin-g with his grandmother (7RT 1392) He was aga-in Oakland, visiting a friend, when he was arrested on December 23 (7RT 1394-1395) He agreed to talk to Sergeant Dunikin and Ser-geant Longmiere, they told Rob that a number of people had implacated him in a shooting. (7 RT 1404, 1405) They also wanted to know if he knew Dontè Lewis. (7RT 1399, 1400) they played a tape recording in which Lewis said he saw Rob go to a red building and come back with a chrome .25 automatic pistol (7RT 1402) They told him he had →

(10)

to contest the charges, and that in prison he
would be victimized by larger, stronger prisoners
(7RT 1405, 1406) They told him that they had
previously helped an acquaintance of his from
his old neighborhood, named Spud, who was
in a serious predicament similar to his, and
they could help him, too, if he would cooperat-
e with them (7RT 1406) They then suggested
a scenario to him: Donté was the one who
fired the shots, but Rob witnessed it. Because
he was a witness, Donté then turned the
gun on him, but he bumped into the wall and
dropped it, and Rob picked it up, making him
a hero because he stopped Donté from taking
another innocent life. (7RT 1406) They suggest-
ed, further, that when he picked up the
gun, it accidentally went off a few times,
because they needed a way to explain the add-
itional shells that were fired. (7RT 1407)
Finally, they suggested, Donté must have
wrestled the gun away from him and fled.
(7RT 1407) They told Rob that if he would
adopt this scenario and make a stateme-
nt, they would tell the District Attorney,
and he would be released. Then they left
him alone to think about it. (7RT 1407)
After just a few minutes, Longmiere retur-
ned to the interrogation room, put on a
pair of gloves and punched him in the face,
saying "that should refresh your memory."
(7RT 1409-1410) Rob stated that his
memory of the next few hours, including his →

(11)

suicide attempt and the hours he spent
at Highland Hospital and John George Psych-
-iatric Pavillion, was indistant, although he
remembered being strapped on a gurney
being cold and talking to a hospital person
at John George (7RT 1414, 1415, 1482, 1483)
Then he was being interrogated again (7RT
1416) Assuring him that they were acting
in good faith and in his best interests, the
officers permitted him to see his girlfriend
Kiesha before the interrogation started on
tape. They said they would let him talk and
visit with her after "he gave them what they
wanted (7RT 1418 -1420) They told him
they just needed him to place Donte at the
scene of the shooting, which also resulted in
him admitting he was at the scene. They repeat
-ed the scenario they wanted him to include
in along the lines indicated by the officers.
(7RT 1424) He made the statements that
he did on the tape because he had been in
-timidated, misled and coerced by the officer
-s.

   Prosecution Rebuttal Case
Sergeant Longmiere stated he did not punch
Rob in the head during the interrogation.
To have done so would have been illegal une-
-thical, and immoral, and might coerce a per
-son into saying something that was not true
thereby compromising their freedom and the
freedom of other persons, (7RT 1517-1518)
Those were "the two main reasons." He added

⑫

"Though I have never done it, I think you'd have a real difficult time beating the truth out some one." (7RT 1518) Sergeant Dunikin stated that he never suggested to Rob during interrogation that other inmates would victimize him in prison (7RT 1594) Such a tactic would be unethical and morally irresponsible and it would be counterproductive, because any resulting statement could be viewed as coerced (7RT 1595) Furthermore he denied that he never didn't want Rob to incriminate Donté Lewis (7RT 1594)

(13)

# Argument I

Appellant's conviction for first-degree must be reduced to second degree murder, because the record does not contain substantial evidence to prove premeditati-on and deliberation

In appellant's opening brief to the Appellat Court, appellant argued that the prosecution was legally incorrect in arguing to the jury that premedita-tion and deliberation with regard to the actual victim, André Jackson, had been proved because the evidence showed that appellant had premedi-tated the killing of Derrick Miller. Here, appellan-t argues in addition, that when the evidence of premeditation as to Derrick Miller is removed from the analysis, the record does not contain sufficient substantial evidence to support a finding of premeditation and deliberation with regard to the actual victim, André Jackson.

In reviewing a sufficiency of the evidence claim, the central inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Jackson V. Virginia (1979) 443 U.S. 307, 319; (People V. Johnson (1980) 26 Cal.3d 557.) In determining whether a reasonable trier of fact could have found defendant guilty beyond a reason-able doubt, the appellant court "must view the evid-ence in a light most favorable to respondent and presume in support of the judgement the existence of every fact the trier could reasonably deduce from the evidence." (People V. Mosher (1969) 1 Cal.3d 379, 395.) However, as the California Supreme

②

Court explained in People V. Johnson, supra, the
court does not limit its review to the evidence
favorable to the prosecution. Rather, the appell-
-ant court's task "... is twofold. First, [it]
must resolve the issue in the light of the whole
record — i.e., the entire picture of the defend
-ant put before the jury — and may not limit
[its] appraisal to isolated bits of evidence selected
by the respondent. Second, [the court] must
judge whether the evidence of each of the
essential elements ... is substantial; it is not
enough for the respondent simply to point to
"some" evidence supporting the finding, for
"Not every surface conflict of evidence remains
substantial in the light of other facts." (Id.,
26 Cal. 3d at pp. 576-577, quoting from
People V. Bassett (1968) 69 Cal. 2d 122, at p.
138) The Court continued:— " A formulation
of the substantial evidence rule which stress-
-es the importance of isolated evidence supp
-orting the judgement ... risks misleading
the court into abdicating its duty to
**appraise** the whole record. As Chief of
Justice Traynor explained, the 'seemingly
sensible' substantial evidence rule may
be distorted in this fashion, to take 'some
strange twists.' Occasionally he observes,
an appellate court affirms the trier of
fact on isolated evidence torn from the
context of the whole record. Such a
court from an acceptable promise that a trier of
(2) fact could reasonably believe the isolated evidence
to the dubios conclusion that the trier of—

reasonably rejected everything that controverted the isola-
-ed evidence. Had the appellant court examined the
whole record, it might have found that a reasonable trier of
fact could not have made the finding in issue. One of the
very purposes of review is to uncover just such irrational
findings and thus preclude the risk of affirming a fina
-ing that should be disaffirmed as a matter of law
(Traynor, The Riddle of Harmless Error (1969) p. 27)
(Id., 26 Cal. 3d at pp. 577-578) In regard to the
sufficiency of evidence for proof of premeditation and
deliberation, in particular, an appellate court looks to
three kinds of evidence: evidence of planning activity, ev
-idence of motive, and evidence of the manner of killing
(People V. Stitely (2005) 35 Cal. 4th 514, 543; People
U. Anderson (1968) 70 Cal. 2d 15, 26-27) These factors
need not be present in my particular combination to find
substantial evidence of premeditation and deliberation, al-
-though "[W]hen the record discloses evidence in all th
-ree categories, the verdict generally will be sustained." (Pe
-ople V. Proctor (1992) 4 Cal. 4th 499, 529) The trial
court found in ruling on appellants motion for new trial,
that up until the point where appellant confronted Andre
Jackson at the door to the apartment there was absolute
-ly no evidence of premeditation and deliberation as to
Jackson. "I think you would also probably agree that up
to the point of that second confrontation when Mr. Jack
-son opened the door rather than Mr. Miller, Mr. Mi-
-ller was not to be found. At that point there appeared
to be no evidence of premeditation and deliberation
as to Mr. Jackson.

(3)

(8 RT 1895) The prosecutor agreed this was a fair statement. (8 RT 1895) The court's finding necessarily means that there was no evidence of motive or planning activity would have to have occured before Jackson opened the door. Thus, the question may be narrowed to whether premeditation and deliberation were shown by the manner of killing Appellant submits the answer is no, because the evidence shows that after a brief exchange of words, the fatal shots were immediate fired. Only two witnesses were nearby at the time of the actual shooting, Parish Blake and Derrick Miller. Neither saw the shooting or the events immediately before it, but each heard the voices of the participants and the sounds of the shots. Parish Blake testified that from his position in the bedroom, he heard appellant ask to speak to Derrick, and Jackson refusing to let him in. (3 RT 514-515) Then Blake heard the front door knob hit the wall someone running down the hallway and shots, "like it was all simultaneous, they all happened at once. (3 RT 517, 555) There were at least four shots in immediate succession. (3 RT 518) Derrick Miller testified that from his position in the bathroom, he first heard a knock at the door of the apartment. (4 RT 681) He heard appellant ask Jackson, "Where's your friend at"? (4 RT 682) Jackson responded "he's in there" (4 RT 683) He heard appellant reply "tell him he's a mark and I'm going to get him." (4 RT 683) Then he heard Donté Lewis say "No Rob", and appellant answered, "I'm not going to do anything [to Jackson], [Jackson] is my partner. (4 RT 684) Immediately following this, Miller heard scuffling and four or five gunshots. (4 RT 684) The scuffling did not last long. (4 RT 713) It was quick. (4 RT 721) The gunshots were in quick succession with no pauses inbetween (4 RT 685) In argument to the jury, the prosecution also took position that the shots were →

(4)

fired one after another, apparently as fast as the
pistol could fire, with no pauses between them. C8 RT
(695, 1828)

Appellant submits here that this evidence was
Constitutionally insufficient to prove premeditation and
deliberation, because no reasonable trier of fact could
have found beyond a reasonable doubt that appellant
premeditated and deliberated the shooting of Jack
-son. It is well established that the brutality of a
killing cannot in itself support a finding that the kille
-r acted with premeditation and deliberation. "If
the evidence showed no more than the infliction
of multiple acts of violence on the victim, it would
not be suffient to show that the killing was the
result of careful thought and weighing of considerat
-ions." (People V. Coldwell) (1965) 43 Cal. 2d 867,
829) People V. Anderson, supra, 70 Cal. 2d 15, 25
As the Court stated in Anderson. Moreover, we
have repeatedly pointed out that the legislative
classification of murder into ... cont on p. 6 →

⑤

two degrees would be meaningless if 'deliberation' and 'premeditation' were construed as requiring no more reflection than may be involved in the mere formation of a specific intent to kill. [Citations.] Thus we have held that in order for a killing with malice aforethought to be first rather than second degree murder, "[The] intent to kill must be ... formed upon a pre-existing reflection ... [and have] been the subject of actual deliberation or forethought ... [Citation] We have therefore held that '[a] verdict of murder in the first degree ... [on a theory of a wilful, deliberate, and premeditated killing] is proper only if the slayer killed "as a judgement plan, carried on cooly and steadily, (especially) according to a preconcieved design." [Citations]" (People V. Anderson, supra, 70 Cal. 2d at p 26)

Here, the evidence does not meet the standards of California Law for showing Premeditation and delibe-ration, because there is no evidence of motive and no evidence of planning activity, and because the manner of killing does not demonstrate, "caref-ul thought," "weighing of considerations" a "delib-erate judgement or plan," a killing, "carried on cooly and steadily," or one committed "according to a preconcieved design. Accordingly, appellant-'s conviction for first-degree murder must be reduced to a conviction for second-degree murder. (People V. Anderson, supra, 70 cal 2d at p. 23)

(6)

Argument II

Dickerson Vs. United States (2000) 530 U.S. 428
The Due process or "Voluntariness test" takes into consider
-ion the totality of all the surrounding circumstances - both
the characteristics of the accused and the details of
the interrogation - to determine whether the accused
will was overborne by coercive police conduct.
Id like to discuss how appellant Robert Oldham was
not granted his constitutional rights which were set
forth to protect those in his situation from injustice.
The rules of the Due Process Clause of the 14th Amend
- ment states that the test is whether the information
from the defendant was extracted by any sort of threa
-ts, violence, or obtained by any direct or Implied
promises, however slighter by exertion of any improper
influence. Appellant Oldham was coerced into giving
incriminating statements during a homocide interrogation
which ultimately concluded in his conviction. With testimo
-ny from the investigating officers, who's threats were
so overbearing to the appellant it resulted in him
committing suicide in the interrogation room, I will
prove how every aspect of the 14th Amendment was
violated in regards to the appellant and why his
conviction must be reversed.

①

note - the following excerpts of testimony are from appellants trial transcripts.

and Page 30 of 75 or Seargant Longeniere - one of the interrogating officers. ⒟ is for William Dooley - Public Counsel for the appellant.

Improper Influence

VOl 6 p1262 ⒟ At the very end of the interview you asked him why he had done it (suicide attempt) and he responded about not being able to see anybody, not being able to say good-bye, recall that testimony? (SL) I do. ⒟ And he further responded after that that "quote" cuz what you was telling me. (SL) Yes. ⒟ What do you recall you had told him that led him to believe that? In. 12 - (SL) So I think he came with a pre-concieved notion of what would be, and as I indicated earlier I told him I had several witnesses and it's not unlikely that I embellished all that I had. I wanted him to think this case was almost insurmountable and the number of witnesses that I had were enough to come in and give testimony that would show his participation in this. So as we talked about it, I wanted to make it big as I could possibly make it and thats what I did. I think thats what he was in reference to, that I told him there was so much against him. - ends In. 23

To further influence Oldham Seargant Longeniere and his partner Seargant Dunikin brought Oldham face to face with a witness who later testified against him, Donte Lewis. Vol 6 p1256 - (SL) Yes sir, I wanted him to believe that Donte was cooperating with the investigation and I thought one way to do that was to bring the two face to face just to show him Donte too →

②

Legend - ⓈⒹ is for Seargant
Dunikin the other interrogating
officer.
Ⓓ is for William Daley
Public Counsel for the
appellant.

Improper Influence

was in my presence and that he may have been telling me
all that had taken place. Ⓓ Now the next day after
the suicide attempt and hospitalization, when you began
the interview with Mr. Oldham did Donte Lewis appear
in his response? Ⓢ Yes sir - p.1255 ln 11 Ⓓ **Discussing**
the statements you had did you also discuss the statem
-ents that you had obtained from Donte Lewis? Ⓢ
You know we may have. ln. 24 Ⓓ There is no requirem
-ent that you be 100 percent honest when — let me reph-
-rase that, there is no requirement to be 100 percent
truthful when interviewing a suspect? Ⓢ That is
correct. - p. 1254 Ⓓ and in order to get him (Oldham)
to talk to you about what happened at 2445 Telegra
-ph ave — you confronted him with a number of
items is that not true? Ⓢ Yes, sir Ⓓ And those
were pictures? Ⓢ I believe so, yes Ⓓ and cassette
tapes of statements that previously had been taken? Ⓢ
Yes sir. —— Continued with Seargant Dunikin ——

p.1165 ln.4 Ⓓ And did you discuss what Donte Lewis had told you?
Ⓢ I cant remember the particulars if we said exactly
what Donte told us but we most definately told him
we had been speaking with Donte. p. 1167 ln.5 Ⓓ Did
you ever play anytapes for Mr. Oldham? Ⓢ No Ⓓ You
never let him hear what Donte was saying? Ⓢ I
can double check my notes but I dont believe we did.

③

→

Legend- Ⓑ is for Matt Beltramo
the D.A. during appelants trial
Ⓓ🄻 is for Donté Lewis, witness
against the appelant

Improper Influence

Ⓓ Was that something you sometimes do in other cases?
ⓈⒹ We've done it before, it wouldn't be something out of
the ordinary, I don't remember playing the tape though.
In. 25  Ⓓ Did you tell him that if he talked about the
shooting, did you tell him what you were going to do
with his statements? ⓈⒹ Yes - 1168 In.1 Ⓓ And what
was that? ⓈⒹ we told him that everything that he told
us, that's going to be relayed, shown to the District Atto-
-rney and that the District Attorney will make a deter
-mination of whether he's going to be charged in a
case - Vol 3 604 - Ⓑ Do you remember Seargant
Dunikin bringing you out of the interview room and
showing you that Rob (Oldham), that you were there
But showing you that Rob was there, do you remember
that? Ⓓ🄻 Yes sir and then he played the tape when
we was in the room together!

Already, as the testimony from both Seargant Dunikin
and Longarieve have been relayed, the foundations of impro-
-per influence have been displayed. Both officers admitt
to the passiveness of confronting the defendant with
an active witness, someones who's testimony at trial
helped in appellants conviction. Someone who Oldham
was told during the interrogation, was cooperating.
and someone who's presence and taped statement
④ was used to influence Oldham to confess to the →

Improper Influence

-accused crime. Lewis, who was not charged in the case, contridicted the officers denial about playing his taped statement to defendant Oldham. Lewis, who did testify against Oldham and had long severed ties with Oldham also admitted that the interrogating officers brought him and Oldham face to face, in an act that was said by the officers, to show appellant that they were serious and that he should cooperate. Even though they deny there involvement in such they do admitt to the jury that it has been done by them in the past, further shedding light to there pattern of corruption, but the commonality of there actions do not mean that they are lawfull. They then continued with telling Oldham depending on what he said and the dynamics of his statements might or might not get him charged. The openness of that state-ment is one of coercive nature too either way. It disrupts rationality with pressure and fear of consequence and inabled the appellant to fully give a voluntary statement. ① he's afraid if he doesnt say anything, all that has been embelished against him would make him seem guilty and result in a conviction ②. he felt even if he did cooperate and admitt some form of what the officers were telling him there's still no way to tell if the P.A would consider not charging him, so ultimately Oldham was binded within the →

⑤

Improper Influence

-ropes of pressure. The totality of the witness, his statement and the admitted embelishments which later resulted in Oldham comitting suicide and confessing to a role in the accused crime, were improper influences under the Due Process Clause of the 14th amendment.

## Argument II Part II

Under The Due Process Clause of the 14th Amendment I'd like to further discuss why those rights were violated through threats and violence by one of the investigating offers. Appellant claims he was assulted by Seargant Longmiere during a break from the interr-ogation. Testimony from both officers place Longmie-re alone in the room with Oldham during the break and both officers admit to not using violence on Oldham but seemingly admit to not knowing how he recieved a profound cut above his left eye which required Oldham to recieve four stitches. Moreso, after the officer left the room, in fear for his life from prior threats of the witness-es and embelished evidence that would be used against him followed by the assult Oldham was driven to commit suicide. Oldham, who has a history of mental disorders and who himself gave testimony of the events that took place, was led to believe the threats of the officers, and rather then withstand the mental and physical abuse he suffered at the hands of the officers he felt helpless and that his only vice for safety would be to persue his own demise.

violence

Vol 7 p. 1519
ln. 4 - 26

(D) But there was an occasion before you left when you heard a noise and re-entered the room - is that right?

(SL) Yes sir (D) And that was without Seargant Dunikin?

(SL) And again I believe it was Seargant Dunikin that made the notation on the door log what had taken place in the room. Now the only thing that I can glean from that was when I went into the room to deal with him (Oldham) Seargant Dunikin was probably behind me, removed the log from the door and made notes. So yes, it would have certainly been me who entered the room but the notations on the door log would indicate that he too was at the door and per--haps beyond the threshhold of the door. But I would not have considered him as going into the room with me. (D) Okay - I mean, did you not make a notation on the log as to that - as to your entry at that times

(SL) No sir. — Vol 6 p. 1243 - (SL) I went back into the room and I spoke with Mr. Oldham - asked him what had just taken place - what just occured - he indicated - I forgot his response in total - but I took a real good look at him - a visual look, he appeared to be okay. I had him sit down in the chair, I just observed him for a few seconds - (if the officer had Mr. Oldham sit in a chair he was supp. use to have already been in, then where was Oldham actually?,

(1)

Violence

he seemed to be fine. I turned and left the room and
closed the door. - Vol 7 p 1519. ln 24-26 - (D) And shortly
after that you left and went to move your car, yes?
(SD) - Vol 5 p. 984 ln. 7-9 - infact I think there was one
point we heard some kind of racket in the room and
sergant Longmiere went to check on him. (D) when
you went to check on him where was he in the
room? (SD) I'd have to look at my notes to be
specific about that, but I remember something abou
-t he was on the floor and Derwin (Longmiere)
told him to sit down -p.985 ln.24 - (D) At some
point your attention was drawn back to the room
after that happened? - p.986 ln. 6 (SD) And I heard
a knock at the door and I answered Oldham, said
he wanted a cigarette, he also said his
head was sore and that he wanted some ice.
Reffering to my report I asked him to look down
so I could view his head. It looked fine,
and it appeared to be no swelling. - p.987 ln. 18, he
also had an abrasion to the top of his eye, I'm
not sure how that was caused, p. 990 ln. 20
(D) Defense Exhibit C-3, do you see that one?
(SD) This is the inside of the interview room -
There is a chair, there ... cont. on p. 3

(2)

Legend - Ⓡ₀ - is for Robert Oldham
defendant and appellant
Ⓑ - is for Matt Beltramo
the D.A during trial

Violence

also appears to be a small amount of, pool
of blood near the chair and my memory
was this was from his abrasion or lacerat
-ion above his eye. p.991 Ⓓ Alright and this
is photograph B-1, who is that, do you recog
-nize that? ⓈⒹ This is Mr. Oldham. Ⓓ Do
you see the injury on his head? ⓈⒹ Yes-then.
-es, looks like four stitches above his left
brow above his left eye. p. 1002 ln.9 Ⓓ Was
there any difference in the way he appeared from
the first to the second day? ⓈⒹ Yes. Ⓓ
What was that? Well, he had four stitches
aboutE his eyebrow or at his eyebrow.... Other
than that there was some swelling around
where the stitches were at, but it was not
as pronounced as it was after the incident
occured.

Vol 7 p.1409 ln.9 - Ⓑ How long were they gone from the room?
Ⓡ₀ Well, as a collective they never cameback into
the room together at the same time. Ⓑ One came
-back by himself? Ⓡ₀ Yes. Ⓑ And how long
was it before that that person came back? Ⓡ₀
That person, maybe about a minute. Well now,
I say about 5 - 3 or 4 (minutes) cuz when they
③ left I had been sitting in the chair for a long

violence
time ⑬ which officer came in & (RO) Longmiere
① what happened after he came in? (RO) when
he came in the room — he sat in the seat he
was sitting in — And when he sat down, he
just — he just looking at me. He is not making
a face. He is not doing that (demonstrating)
at the time. But he's just really like looking
through me — really like a piercing look. And
he's like "So you don't know nothing huh? Shaking
my head at the time. And so he goes into his
little pocket and he is putting on his gloves and
he is looking at me the whole time he is
doing this. And he sits his hand on the desk
and he is looking at me, and asked me again,
"So you don't know nothing huh"? And I'm shak
-ing my head no at him and he say "You think
your cool huh"? "Take that hat off! And I had a
black Gucci hat on and I take the hat off and
put it on the table. And at the point I took the
hat off, did like he said — and I looked at him
for like, what's next? And he stood up. And
when he stood up I thought he was going
to leave. But when he stood up he took a
step forward reached down and punched me
④ in my head. — 1410 In. 1 — and at that time

Violence

I didit Exactly know I was hit until I landed
on the ground. And when I got hit it was like
everything went **blank**, then when I landed I woke
back up again and Im on the ground and I got
my hand behind me like this (demonstrating) and
I'm looking up at him and I gave him the look
like, why? what? I was going to ask him what
happened. And before I could say anything, he was
like "that should refresh your memory". While he was
doing that, he was taking his gloves off and does
like a slither move out the door, closes the door
and leaves. And then I'd say 10 seconds, wasn't
no more then 10 seconds, his partner came in, the
other guy, Dunikin, he comes in and when he
comes in I'm still on the ground, and I'm looking
up and he's like "are you alright kid? And like,
" What happened? you alright kid. And I'm look
ing up like " Yeah I think so", and he's like
what happened? " I just got hit in my head
and I think I'm going to need some ice". He
said "alright I'm going to get you some ice - ends
ln. 26 —— Vol 1 pg. 212 ln. 23 (SD) Yeah I think-
yeah, he wanted a cup of water I believe, and I
know he said "maybe I should have some ice
and I believe it was in reference to his head.

⑤

Violence

Those statements combined with the defendants which were also during his trial place Longmiere in the room with Oldham, and Seargant Dunikins testimony also corroberates with the fact that after Longmiere left the room he found Oldham on the floor and afterwards Oldham said his head was sore and asked for some ice, Soon after when Dunikin left the room to retrieve the ice, Oldham who was overborne by all of the events that happened, attempted to take his own life by tieing his shoestring to the door on one end and around his neck with the other. In evidence photograph B-2 appellant is shown in a neck brace, ready to be taken to the hospital just after his attempted suicide in the interrogation room. In B-3 Dunikin points out the ligature marks on appellants neck where the shoestring was cut into him. B-4 shows that appellant was fitted with an oxygen mask before being transferred to the hospital. Photo C-1 shows where appellants blood was on the floor of the interview room. Photo D shows the shoestring that was tied around appellants neck and around the doorknob. Referring back to the questioning of the

⑥

violence

accused officer by defense council William Daley, quote
" At the very end of the interview you asked him
(Oldham) why he had done it (suicide attempt)
and he responded about not being able to see
anybody, not being able to say goodbye, recall
that testimony? (SL) I do. (D) and he further
responded after that that he said "quote" cuz
what you was telling me? (SL) Yes (D) Do you
recall what you had told him that led him to believe
that? And as I've stated earlier Seargant Longm-
-iere admitted to embelishing the case to the
point to where Oldham would feel he had no
option about the outcome of what he was being
questioned about. He did so with erronous
exaggerations and even more so with the physical
appearance of an active witness and that witness
-es statement on tape which the witness admitted
to being played, to further intimidate Oldham.
Then shortly attwards with the assult by Seargant
Longmiere the overbearing circumstances of the
interrogation led Oldham to succumb to the fear
that was forced upon him. At the time Oldham
had not admitted to anything or made any
taped statements, so labeling his actions as
⑦   an act of guilt would be immoral. His actions we-

violence

-ve the result of the two Seargants predatory actions which not only included threats, but the fact that the physical force cemented the notion in Oldhams mind that they meant to follow thru with them. The seargants unlawful tactics violated Oldhams rights under the Due Process Clause of the 14th amendment which states that the test is whether the information from the defendant was extracted by any sort of threats, violence, or obtained by any direct or implied promises however slighter by exert-ion of any improper influence.

After Oldhams hospitalization, he was returned from the hospital 11 hours later and immediately questioned again. Despite being distraught from the earlier events Oldham was asked to sign another Miranda waiver after they unsuccessfully recieved any information under the first waiver. Oldham waived his Mir-anda rights again but being that the earlier events and hospitalization was only a few hours apart it is with regards to the 5th amendment that the appellant didn't make a knowing and intelligent and voluntary waiver of those rights. (People Vs. Neal) (2003) 31 cal. 4th

⑧

violence

-63, 79.) However, because the inherently coer
-cive nature of custodial police interrogation
hieghtens the risk that an individual will not
be accorded his priveledge under the 5th am-
-endment, the supreme court has also laid down
concrete constitutional guidelines governing the
admissability of statements giving during custo-
-dial interrogation. (Miranda Vs Arizona) (1966)
384 U.S. 436) Statements made during custodi
-al police interrogation are admissable
in the prosecutions case in chief only if the
person making them has already been properly
advised concerning his right to remain silent and
his right to have a lawyer, and if he has
made a voluntary, knowsing, and intelligent
woiver of those rights (Id. at p. 444) and
being that appellants rights were violated in totalit
-y, from the officers conduct, to being returen
-ed to the same interrogation room and being
interviewed by the same officers only 1 hour
after returneng from the hospital, along with
with his physical injuries to his eye and locer
ations on his neck from his attempt at suicide,
the defendants waiver was not one of intelleg-
(9)  -ence of of his free and rational choice. →

violence

[Greenwald V. Wisconsin) (1968) 390 U.S. 519, 521) Conside
ring the totality of these circumstances we do not think it
credible that petitioners statements were the product of
his free and rational choice.) Dr. John Podboy, a clin
ical and forensic psychologist (2 Rt 367) testified
that he interviewed appellant on January 28, 2003, a
few weeks after the interrogation (2 RT 370) Subs
equently he also reviewed the hospital records and reco-
-rds of the Oakland Police Department who for years
in recent memory have come under fire for miscond
-uct. (2 RT 372) He also concluded that at the time
of the interrogation, appellant was suffering from major
mental illness, perhaps Schizoid Affective Disorder.
He observed that on August 5, 2003, during a confin
ment at Atascadero State Mental Hospital, appell
-ant had been diagnosed with major depression with
psychotic features in remission. (2 RT 372) when
Atascadero released appellant back to the court system
he was given antipsychotic medications including, Ola
-nzapine (Zyprexa) an antipsychotic, Lorazepam an anti.
anxiety drug and Celexa, an anti-depressant, anti-anxie
-y and antipsychotic drug) 2 RT 377). While (... cont on
p. 11) these medications would cause the ordinary healthy
person to be so sedated as to be unable to stand
with appellant they actually caused a dramatic
improvement to his symptoms. This demonstrated to
Dr. Podboy that appellant's symptoms were real, and
that they were serious. (2 RT 378) Moreover, dur-
-ing the interrogation process he was detached from
the real world (2 RT 373) Dr. Podboy observed
finally that it was very doubtful that appellant
was able to understand his Miranda Rights, at
the time of the second interrogation. This was so
because he was contemplating taking his life, and →

(10)

violence

then taking action to do so, it is not possible for a person who contemplated such, to at the same time be focused and aware of everything going on in the interrogation room. Dr. A -boy stated "I find the two to be mutually exclusive. (2 RT 380) Indeed persons who attempt suicide are at risk for the remaind -er of their lives, from a psycological perspective. (2 RT 408 Even a feigned suicide attempt can have disastrous consequen -es, including potential brain damage, and it is something that stays with an individual for a long time. (2 RT 409) Dr. Podbar stated, further, that a person in appellants state of mind would not be able to knowingly and intelligently waive his Miranda Rights (2 RT 380) He stated that this opinion applied to the purport -ed Miranda waivers both before and after the suicide attempt and hospitalization. "There is no reason to believe that there was a substantial alteration in his mental functioning (2 RT 381) Furthermore, appellant's statements to police were certain -ly not completely voluntary, in the sense of being given consc -iously, with full conscious control (2 RT 584) So with his 5th amendment also being violated under the Voluntariness Act of the 14th amendment I'm asking that this petition be considered and that appellants conviction be overturned.

## Argument II Part III

Appellant submits the argument that his 5th and 14th am-endment rights were violated throughout the second session of the interrogation being that his statements were obtained thru Direct and Implied Promises. Following the assult, suicide attempt and hospitalization, appellant was returned to the interrogation room only 11 hours later and questioned only an hour later after returning, despite him being distraught. Because of his lack of cooperation during the first interview, the interrogating officers offered Oldham a chance to see his girlfriend but told him if he wanted to do so he'd have to cooperate. During that time the officers struck a propo-sal to Oldham, that if he'd go on tape he'd get a visit at the end of the interviews. The officers then obtained 3 taped statements from Oldham and followed up the promise of letting him have a visit at the end, thus violating Oldhams rights to volunt-ariness. Also infringing his 5th amendment rights being that the promises indirectly gave him no choice about remaining silent and (2) under the 14th amendment forced him to give incriminating statements. Appellant is asking that his sentence be reversed and that a new trial is granted at which the statements should be suppressed.

Direct or Implied Promises

Vol 5 p. 982 (1) And did you ever make him any promises of any sort? (SD) NO promises — p. 1179 ln. 17 (D) And when did Kiesha's name first come up? (SD) We started around 6:59am and on direct we talked about how he was upset about his birthday and whatnot. And it wasn't long after that that I remember Kiesha's name coming up and that he wanted to see her. (●D) Vol 5 p. 1003

ln. 26 Did he continue the denials, that is, during the first day. (SD) They were different denials though — 1005 ln. 1 — and the next thing he's saying is, I don't have the gun. I wasn't there, he back into denial again. Vol 6

p. 1180 — (D) 7:55am called Kiesha in front of him to come to C.I.D and this was literally done in front of him so he knew the call was made? (SD) Correct (D) And why did you do that? (SD) We wanted to keep the lines of open communication with him. I guess we didn't want him to think we were totally bad guys. — ln. 24 (SD) NO, we made it clear before we made the call that they weren't able to be able to talk before the interview was over because we didn't want to taint whatever it is that he was going to say. p. 1005 ln. 28 (D) Did she come down? (SD) Yes she did. (D) Did you actually allow him to see her? (SD) We took a break at one point when we were walking Mr. Oldham back from the bathroom.

(2) Kiesha I'm not sure of her last name offhand — was

Direct or Implied Promises

there and they made eye contact with each other. We did not allow them to talk. And was escorted back into the interview room. She happened to be standing outside of the homicide section. (D) And where was that? (SD) There is an area near our office which is between the bathroom and our office. She is in the waiting area around the corner and they see each other. (D) Is that contact noted on the door log? take a look and tell me what time. (SD) 8:34am - ends 1007 hrs

So clearly, again officer Dunikin contradicts his statement of denying making Oldham any promises and, verbally admitts to implying and following thru with the promise of letting Oldham see his girlfriend. He said it was done so, "quote" "I guess we didn't want him to think we were totally bad." But the same misleading conduct by the officer is the same misleading manipulation that made Oldham think his life was in danger of never being what it was pretaining to his freedom, the same suicide attempt inducing conduct. There was clearly an arrangement as the officer says "quote" NO we made it clear before we made the call they weren't to be able to talk before the interview was over." He further went on to say that "it is so they wouldn't taint whatever he was going to say. However, trying to slight what was arranged by saying-

(2)

Direct or Implied Promises

that, does not change the fact that an arrangement was
made between officers and Mr. Oldham, and that arrang-
-ment was the foreground to the next series of events

7182 Vol6 ln.10 — (D) Now, we've had 3 tapes played today - or yester
-day, and Tay (Donte' Lewis), do you recall when in
relationship to those tapes he actually saw Kiesh
-a? (SD) He saw her around 8:30 am, so the tape,
we went on tape at 9:25am and I think that was
the first taped statement. (D) So he saw that
Kiesha was physically present in the room, or physi
-cally present at the station before you even made
your first tape? (SD) Correct. — Vol 6 p. 1163 (D) I
believe your testimony has been during that interview
on the 23rd where for that approximately 1 hour
45 minutes he told you he wasn't there? (SD) Correct
(D) and you did a number of things to try to get
him to talk about that, is that correct? (SD) Yes. —

Vol5 p. 1011 ln.11 — (SD) Well at this point knowing what happened on the
23rd we wanted to talk to him, but he denied every-
-thing and I think we covered that, and now the
next day on the 24th he is starting to change
from the denial statement he made obviously, he is
admitting to knowing hil two who we suspect at
this time of being Donte'. He's changed his story
from not knowing anybody in that neighborhood to

(3)

Direct or Implied Promises

knowing things involving this murdercase, involving
Andrea Jackson - ends ln. 19

So again the officer admitts that after
Oldham see's Kiesha, he goes from denying everythin
-g to changing his story and obeying the guidelines
that were set before him in the earlier arrangement.

vol 6 p. 1181 ln.6  (D) By the time you made the call he asked to speak
to her. You had arranged for her to be present. You
said " You cant talk to her until you and I are
through talking. (SD) That is correct. (D) And later
on you actually - he actually got to see Kiesha is
that correct ? (SD) Yes - p. 1182  (D) Did Kirsha
remain at the station ? (SD) I may have seen her
through one of the breaks, because there was a
time there where Robert took a nap before 12:00
when we got him the cookies, I may have seen
her at that point briefly. But the only time I coul
-d picture seeing her is when we allowed her to see..
... (D) That was after you had taken all three taped
statements? (SD) Drobec, who was the D.A on the call
out, I don't think she had a problem with it eith-
-er so we allowed them to see each other.

And again and in conclusion, they told Oldham
he wouldnt be able to see his girlfriend until they
(4)  finished talking, and regardless of the fact if the on

Direct or Implied Promises

call D.A had a problem with it or not, they made
a deal earlier, one which didn't involve an on call
D.A, and followed thru with it resulting in appellant
giving them incriminating statements. The statements
were obtained through the promise of Oldham being
able to see his girlfriend, and as mentioned, before
the arrangement Oldham denied everything.

It has long been held that the due process clause of
the Fourteenth Amendment to the United States Constitu
-tion makes inadmissible any involuntary statement obta
-ined by a law enforcement officer from a criminal
suspect by coercion. (E.g., Jackson v. Denno (1964)
378 U.S. 368, 385-386, Brown V. Mississippi (1936)
297 U.S. 278, People V. Weaver (2001) 26 Cal 4th 876,
920, People V. Benson (1990) 52 cal. 3d 754, 778,
see generally 2 LaFave et al, Criminal Procedure (2d
-ed. 1999) § 6.2, pp. 441-467.) Voluntariness does
not turn on any one fact, no matter how apparently
significant, but rather on the totality of the circum
stances." (Withrow V. Williams) (1993) 507 U.S. 680,
688-689, accord, e.g, Haynes V. Washington (1963)
373 U.S. 503, 514, People V. Weaver, supra, 26
Cal 4th at p. 920, People V. Williams (1997) 16 Cal.
4th 635, 660, see generally 2 LaFave et al, Crimi
-nal Procedure, supra § 6.2 pp. 441-467). In consid-

(5)

Direct or Implied Promises

-ering whether the suspect made a knowing and intelli-
gent waiver of his rights, courts must be careful to
recognize that the two requirements are independant
"only if the totality of the circumstances surrounding
the interrogation reveals both an uncoerced choice
and the requisite level of comprehension may a cour
t properly conclude that the Miranda Rights have
been waived" (Moran V. Burbine (1986) 475 U.S.
412, 421 (emphasis added) Edwards V. Arizona
(1982) 451 U.S. 477, 482 - 484)

Thus, the court must ask whether the
suspect understood his right to remain silent
and his right to counsel and whether he intellig-
-ently and knowingly relinquished them. (Id., at p.
484) In other words, "the relinquishment of the
right must have been voluntary in the sense that
it was the product of a free and deliberate
choice... ( see e.g. Mincey V. Arizona (1978) 437
U.S. 385, 398 (1978) [It's hard to imagine a situa
tion less conduceive to the exercise of a ration
-al intellect and free will than Mincey's] Beecher
V. Alabama (1967) 389 U.S. 35, 37 [" Still in a
kind of slumber from his last morphine injection
feverish, and in intense pain, the petitioner
signed the written confessions thus prepared
for him"] Davis V. North Carolina ... Cont on p. 7

⑥

Direct or Implied Promises

(1966) 384 U.S. 737, 742 His level of intelligen
-ce is such that it prompted the comment
by the court below, even while deciding
against him on his claim of involuntariness,
that there is a moral question whether a per
-son of Davis' mentality should be executed]
Reck V. Pate (1961) 367 U.S. 433, 440 ["if
a defendants will was overborne], the con
-fession cannot be deemed "the product of
a rational intellect and a free will] Culombe
V. Connecticut (1961) 367 U.S. 568, 583 [An
extra-judicial confession if it was to be offer
-ed in evidence against a man, must be the
product of his own free choice.

During the 3 taped statements appellant
was asked by the officers was he assulted
by anyone and because of the deal that
was made to see his girlfriend he denied
being assulted, and feeling that if he admitt
-ed to being assulted it would ruin his
chances of seeing his girlfriend. he said on
tape that "he didit remember what happened
to his eye. But the testimony from Oldham
and both interrogating officers do corrober
⑦ -ate and the nature of his injury does →

Direct or Implied Promises

suggest and prove that the appellant was assulted.
Payne V. Arkansas, (1958) 356 U.S. 560, 567.
[It seems obvious from the totality of this
course of conduct, and particulary the culminating
threat of mob violence, that the confession was
coerced and did not constitute an expression of
free choice] Vol 6 p. 1197 ln. 27 (D) And do you
recall the question as to why he thought that
would happen? - and his response was "NO cuz
what you were telling me? (SD) I remember
that (D) What did you tell him to make him think
he might never see his mother or girl again? (SD)
I think it wasnt that we told him he would
never be able to see anybody again, its the prep
-onderance again of the evidence; hey we talked
to Berna, we have talked to Donte, there is
other information the physical evidence if you will,
the case packet, and you know, so basically we
were there to cover the who, what, where, when
and why. And I believe it was the preponderan
-ce of all of those things that may have caused
him to take the actions that he did, but it
wasnt anything that we specificly said.

(8)

Legend — TC stands for
the Court - in refere
-nce to the judge
answering and asking
questions.

Direct or Implied Promises
If I may have a minute (addresses the court)
TC By preponderance are you meaning the weight
-t of what you had? SD Everything - the culmin
-ation I guess might be a better word, every
thing that we had. TC The totality of it!
SD the totality of it, thank you your honor
- ends ln, 24

    In this case, based on the totality of the
circumstances, the conclusion seems inescapable
that, by attempting to kill himself in the interrog
-ation room, appellant was indicating that he
was truely intimidated by the threats and
physical force and did not want to further talk
with the officers. Yet only a few hours after
the attempt, appellant's interrogators resumed
the interrogation. While police witnesses observed
that the psychiatric personnel at John George
Pavillion had cleared appellant for a return
to the police's custody, there was no indication
that those personnel had endeavored to deter
-mine whether appellant was in a psychological
state that would permit him to deal with the
pressures of a murder interrogation, or that
he had been "cleared" for interrogation. Rath
⑨ -er, appellant submits, the officers decided

Direct or Implied Promises
to take advantage of appellant's weakened condition
by continuing to question him despite his obvious
distress. In these circumstances Dr. Podboy's
testimony makes perfect sense and fully support
-s a conclusion that appellant was not in an
appropriate state of mind to understand his rights
or to make a knowing and intelligent waiver
of them. The officers promise to the appellant
that they would arrange a meeting between
him and his girlfriend when the questioning
was over, added additional pressure on appella
-nt Oldham to confess in order to achieve that
benifit. Accordingly, appellant submits that it was
error to admit his statements into evidence, it
remains to be considered whether the error
requires reversal, appellant submits that it does.
     The erroneous admission of the statements
into evidence is of course, not reversible per se,
but rather is subject to harmless error
analysis under the beyond-a-reasonable-dou
-bt standard of (chapman V. California) (1967)
386 U.S. 18 (chapman) the Chapman test
is generally applicable to error under the United
States Constitution, including, specifically →

(10)

Direct or Implied Promises

the erroneous admission of involuntary statements (Arizona V. Fulminante) (1991) 499 U.S. 279, 310) The beyond-a-reaso-nable-doubt standard of Chapman "require[s] the bene-ficiary of a federal constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained (Chapman, supra, 386 U.S. at p. 24)" To say that an error did not contribute to the ensuing verdict is .... to find that error unimportant to everything else the jury considered on the issue in ques-tion as revealed on record." (Yates V. Evatt (1991) 500 U.S. 391, 403) Thus, the focus is on what the jury actually decided and whether the error might have tainted its deci-sion. "That is to say the issue is whether the .... verdict actually rendered in this trial was surely unattributable to the error." (Sullivan V. Louisiana) (1993) 508 U.S. 275 279) In chapman, the court stated that "error in admitt-ing plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot .... be concieved of as harmless. Chapman, supra, 386 U.S. at p. 24) In (people V. Cahill (1993) 5 Cal. 4th 478, the California Sup-reme Court expressed a recognition that confessions as a class, [a] most invariably "will provide persuasive evidence of a defendants guilt [citation] .... that such confessions often operate "as a kind of evidentiary bombshell which shatters the defense [citation] .... [and therefore] that the improper admission of a confess-ion is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial .... (Id at p. 503) Here, the prosecution simply cannot show that the admission of appellants statement s did not contribute to the verdict. In his statements appellant placed himself in connection with murder but only under the influence of ➤

⑪

Direct or Implied Promises
interrogating officers, Accordingly appellants conviction
should be reversed and a new trial ordered
at which the statements should be ordered suppresse
-d

Appellants conviction must be reversed because a Deputy Sheriff who was in charge of the jury was also a key prosecution witness. Thus Viol-ating Appellants fourteenth Amendment Due Process Rights, and his sixth Amendment Right to Trial BY AN IMPARTIAL JURY.

Near the end of the trial, the court convened with the defendant and counsel outside the presence of the jury. It observed that the bailiff in this case Deputy Ortman, was also the bus driver who trans-ported appellant and other inmates to the courthouse from Santa Rita Jail each day. (7 RT 1532-1533) The court stated that it had been informed that on the bus, Ortman had observed appellant to pass a piece of paper to another inmate. The paper had been confiscated. It was a copy of the witness list that had been attached to the jury questionnaires. On it, there was an arrow that had been drawn, pointing to the names of some of the witnesses, one of which was Derrick Miller. The court stated it had been informed that Mr. Miller was then removed from the bus and that appellant had been heard to remark to the person to whom he had passed the paper, "Thats

(1)

. Impartial Jury

- the dude". The prosecutor stated that he proposed
to call Ortman to testify to the jury about this incid
-ent. (7 RT 1533-1534) Defense trial objected, on the
grounds that the bailiffs daily contact with the jurors
placed him in a special position, and because of
that direct contact, he had become a friendly aquai
-ntance of all fifteen (7RT 1534) In response, the
court stated, " So your point is that somebody charged
with a criminal offense has a license to do any
darn thing they want to as long as they do it in
front of the bailiff" (7RT 1534) Defense
trial counsel replied, " Im just pointing out to the
court the difficulties of this. We have a new
witness who is a friend of the jury" (7RT 1534)
The court ruled that it would permit the deputy
to testify, but would prohibit him from acting
as a bailiff any longer in this trial (7RT 1534)
The prosecutor subsequently called Ortman to the
stand, and he testified that, as a deputy
sheriff, he was frequently assigned to handle
transportation of inmates from Santa Rita Jail
to the courthouse in Oakland for trials, and on
the morning preceeding his testimony, he had
transported appellant Oldham and 42 other
② inmates. (7RT 1569-1570) One of the other inmates →

Impartial Jury

on the bus was Derrick Miller. (7RT 1571) Before the bus left Santa Rita, Ortman observed appellant pass a folded piece of paper from the compartment he was confined in to an inmate named English, who was in the compartment Behind him. Miller was confined in the same eleven-man compartment as English. (7RT 1572) English unfolded the paper and looked at it and then passed it back to appellant 7RT 1574) Ortman decided he would remove Miller from the bus to assure his safety. As Miller was taken from the bus, Ortman overheard appellant say to English "Thats him"(7RT 1575, 1576) Ortman then proceeded to the courthouse with the remaining inmates. After arriving at the courthouse, he retrieved the paper from appellant with no incident. (Peoples Exh. 65 7RT 1577, 1578) The paper was a copy of a witness list. Next to Derrick Miller and other names there was an arrow pointing at the names. In rebuttal of this testimony, the defense called inmate English. English testified that although he was on the bus with Rob, thier conversation only involv-ed small talk. Rob did not pass him any papers. there was no discussion of witness. Appellant him-self also testified in rebuttal. He testified he did pass English a copy of the witness list in this

③

Impartial Jury

case but only because he wanted to show him that the prosecution had a weak case base entirely on hearsay. He also told English the real perpetrator in this case was Donte Lewis, whose name was highlighted with an arrow, along with, Derrick Miller, Cotoye Ford, and James Gill on the list, and that he did so in order to indicate to his attorney that they were in custody and should be subjected to addition- -al questioning when they testified (RET 1616, 1617) Appellant further stated that the writing next to one of the names that resembled the letters D E were merely scribbles from trying to get his new pen to work, it was not the word <u>die</u> as the prosecution stated, or any other word for that matter. (RET 1617, 1618) When the appellant was transported to court that day - being that he was an M.I.R classified inmate (Move, in, restraints) he was loaded on the bus last due to the time it took to place him in restraints. Appellant had noway of seeing or knowing Mr. Miller was on the back of the bus being that he was isolated due to his classification. Ortoman did testify that Miller was loaded on the bus first, specif -ically, so Oldham would not be able to see him. He also stated that Oldham, because of

④

Impartial Jury

his restraints was placed in a small two-man compartment on the bus, which is divided from the compartment Miller was in by a solid metal wall. He stated he never heard Oldham make any threats on this occasion or the other occasions he transported Miller and Oldham together, occasions where both inmates were visable to each other, he only states Oldham said "Thats Him" when he escorted Miller off the bus ( 7 RT 1579-1583) Appellant did nothing legally wrong and the witness who was supposed to have been transported separately any- -way, was not harmed and the bailiffs testi- -mony was blutently prejudice to Oldham's cre -dibility. Appellant submits here that it war error to permit the bailiff to test- -ify to the jury. The United States Supreme Court has frequently recognized the due process and Impartial Jury problems inherent in permitting a trial bailiff, who is charged with the care and custody of the jurors also to be a witness for the prosecution in a criminal trial. ( Gonzales V. Beto () 1972 405 U.S. 1052; ( Turner V. Louisiana (1965) 379 U.S. 466: ( Parker V Gladden (1966) 385 U.S. 363. In Gonzales V. Beto, supra, the county sheriff played a dual role at the defendants trial, for he was not only the key prosecution witness against petitioner, but the bailiff to the jury as well. As a bailiff he was responsible for the care and protection of the jurors, and therefore he had substantial contact with and authority over them during the entire course of the →

(5)

Impartial Jury

of the trial. On several occasions, he conducted them in and out of the courtroom on the instr-uctions of the judge. Once, the judge even asked him to step down from the witness stand, where he was under going cross-exam-ination, in order to retire the jury. In his role as bailiff, the sheriff walked with the jurors to a local restaurant for lunch, con-versing with them on the way. At the rest-aurant, he ate with them in a private room where the conversations continued. Late in the afternoon, while Jurors were deliberat-ing in the case that turned so largely on thei-r assessment of the sheriff credibility, they asked the sheriff as bailiff to bring them soft drinks in the jury room which he did. Based on the bailiffs dual role, The Supreme Court summarily reversed the defendants conviction, citing Turner V. Louisiana, supra 379, U.S. 466 in a concurring opinion, Just-ice Stewart who had authored the courts opinion in Turner - joined by two other just-ices, explained why permitting the bailiff to play this dual role was inconsistant with the defendant constitutional rights of the 6th amendment due process law and trial by an impa-rtial jury. The concurring opinion stated:

"Naturally, the extent and intensity of a bailiffs association with a jury will vary from case to case. But in the petitioners case I cannot say that it was by any means de minimis. Although the trial lasted only one day and the jury was not sequestered with the county sheriff, the association →

(5)

Impartial Jury

between the jurors and the witness-bailiff
was an extended one, and the duality of
the witness-bailiffs roles was inevitably
driven home to the jury. And, although the
witness-bailiff may not have spoken to the
jurors about the case itself outside of the
courtroom, "Turner" makes clear that even
if he never did discuss the case directly
with any member of the jury, it would be
blinking reality not to recognize the extrem
-e prejudice inherent in this association throu
-ghout the trial between the jurors and [this]
key witness for the prosecution." 379 U.S., at
473 "It is enough to bring the petitioners
case within the four corners of "Turner" that
the key witness for the prosecution also served
as the guardian of the jury, associating exten
-sively with the jurors during the trial."
(Gonzales V. Beto, supra, 405 U.S. 1052
1053 [conc. op'n of Stewart, J] emphasis
added). In Turner V. Louisiana, supra,
379 U.S. 466, two deputy sheriffs had
served identical dual roles as prosecution
witnesses and jury custodians testifying
as to the circumstances of the defendants
confession while shepherding the jurors
through a three-day trial. During the trial
the jury was sequestered and was in "close
and continual association" with the deputies (Id
, at p. 468) The deputies ate with jurors, conv
ersed with them, and did errands for them.
        The Supreme Court held that
the prejudice inherent in that situation violat
-ed the defendants due process right under →

⑦

Impartial Jury

The 6th amendement to a fair trial before an impartial jury. "It would have undermined the basic guarantees of trial by jury to permit this kind of association between the jurors and two key prosecution witnesses who were not deputy sheriffs. But the role that Simmons and Rispone played as deputies — cont on p. 9

8

(TC) stands for the court meaning the judge asking and answering questions.

## Impartial Jury

made the associatation even more predjudicial, "For the rela
tionship was one which could not but foster the jurors
confidence in those who were their official guardians
during the entire period of the trial." (Id; at p. 474;
see also, Parker V. Gladden (1966) 385 U.S. 363,
365 [The official character of the bailiff - as an
officer of the court as well as the state - beyond
question carries great weight with a jury] Based
on these authorities, appellant submits there that
defense trial counsel's objection to bailiff Ortmans testit
-ying as a witness was well taken, and should have
been sustained by the court. (TC) "The jury has left, Mr
Daley you wanted to have a sidebar before the witness
testified, you had an objection to him testifying? (D) -
That is correct your honor, he was obviously a deputy
or bailiff for this jury for is it five weeks now
or more? It seems like it has been going on forever
(TC) When he has been here (D) Yes, in the normal
course of events, bailiffs are expected to develop
a relationship with the jurors, and now suddenly
he's become a witness. This particular develop
-ment had been known prior to trial, you know.
He's basiclly an aquantince of all 15 people on
the jury. (TC) A little hard to know before the
trial when this happened this morning. (D) That's
right, on the other hand one would question
why the sheriffs Department, a part of -
(p. 1590 cont)- the system would have - would
put deputies in the posittion where they
potentially become witnesses and create this
problem. (TC) Well, I do think that's true
in almost every instance, and you may go ahead,
Im sorry, didnt mean to interrupt. (D) We
are talking about transporting deputies in situa

al 7 p. 1589 →

(9)

Impartial Jury

-tions where the witnesses and the accused
are on the same bus, thats not necessarily
what happened and it's not an unforeseeable
event. (TC) No, it's rare enough, though. And I
know I've only been working in this system
about 40 years now but this may be the seco
-nd time in all of those years - probably closer
to 30 [years] as a lawyer and as a judge - th
-at I have seen it come up. Maybe the second
time. (D) Yes, what it does it created a problem.
You suddenly have a witness on the stand
who knows, who is aquainted with all the
jurors. (TC) You made that objection earlier.
(D) Yes - ends on ln. 21.
            As stated by the concurring justices
in Gonzales v. Beto, supra, it is enough to
bring appellants case within the four corners
of Turner, that Ortman, whose testimony
the prosecutor obviously felt was extremly
important to his case being that he testi-
-fied last and was trusted by the jurors
during trial. The error is particularly acute
in the circumstances of this case. In the
first place, appellant observes that his trial
was a lengthy one. Jury voir dire didnt
end until 2 weeks after it began on August 22, 05
(1 CT 201) and bailiff Ortman didnt testify until
September 21, 2005 almost exactly a month later
(1 CT 258-259) Thus bailiff Ortmans associat
-ion with the jury was much longer than the
one-day trial in Gonzales v. Beto, supra
, or even the three day trial involved in (Turner
v. Louisiana, supra) Furthermore, although
the trial court replaced Ortman as bailiff →

(10)

Impartial Jury

after his testimony, this action was not effective
to cure the underlying problem because Ortman
already had established a special relationship
of trust with the jury due to his role as bai-
-liff for the month before he testified and
so when he testified, would naturally occupy
a special position vis-a-vis other witnesses
who were strangers to the jury. Finally Ortm-
-ans testimony was not peripheral or unimpor
-tant. Appellants defense depended almost entir-
-ely on his credibility with the jury. The prosecu
-tor used appellants credibility as the target of
Ortman's testimony by calling him a liar arguing
that his lies showed "consciousness of guilt"
Also he further gave a onesided story to the
Oakland Tribune, where he accused appellant of
trying to "disuede a witness", further adding
preajudice towards appellant in totality. Referr-
-ing to peoples exhibit 65, the witnesses list
that Ortman testified he confiscated from ap-
-pellant, the prosecutor stated to the jury; (B)
"The one that I really like was the last one
the defendant told, the last lie, Remember peo-
-ples Exhibit 65? This was the witness list
that Deputy Ortman told you about, the one
that I asked to be published to you, I asked
that you be permitted to see it, I asked the
defendant - or actually, Mr. Daley asked the
defendant - there is some writing next to
the name here, Derrick Miller. Well look at
it ladies and gentlemen. I mean there is an arro
-w, there is a word next to the arrow. To me
it looks like the word "die", I mean it's possible
that it says something else. Maybe it's the →

(11)

Impartial Jury

of Dwight Eisenhower, I don't know. Thats clearly a word, why deny that? The defendant is a pathological liar. I mean he has an arrow pointing from that word to Miller, to Miller's name. Remember I said how hard it is to be a wit-ness in Oakland." (8 RT 1722-1723) The inferen-ce suggested the prosecutor was clear: not only was guilty of shooting Andre Jackson but is ad-dition, he was a cold-blooded killer who mea-nt to eliminate persons who testified against him.

The Supreme Court reversed the defendants convictions and ordered new trials in Turn-er V. Louisiana, supra, and Gonzales V. Beto, supra, without discussing the doctrine of harmless error, holding that the due process and impartial jury trial violations caused by the bailiffs dual roles as witnesses in those cases were so violative of fundemental due process principles surrounding the 6th amen-dment that reversal per se was appropriate. For the reasons he has stated above appellant submits that the error was in fact prejudic-ial in the circumstances of this case but in addition, he submits he is entitled to a reversal, without a showing of prejudice based on Gonzales V. Beto, supra, and Tur-ner V. Louisiana, supra, ( See, e.g. United States V. Olano (1993) 507 U.S. 725, 739 [Supreme Court cites Turner V. Louisiana supra, us showing a situation where the error must be presumed to have been prejudi-cial]; Mu'Min V. Virginia (1991) 500 U.S. 415 442 fn. 2 [dis. op'n. of Marshall, J, joined

(12)

Impartial Jury
by Blackman and Stevens, JJ.] [Turner V. Louisiana, supra held that "jurors placed in custody of deputy sheriffs who were key prosecution witnesses [were] presumed incapable of rendering impartial verdict"] United States V. Rutherford (9th Cir. 2004) 371 F. 3d 634, 643 fn. 7 [ In Turner V. Louisiana, supra reversal was based on presumption of prejudice.] Accordingly, appellant's conviction must be reversed, and a new trial ordered.

(13)

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

People of the state of California

**PLAINTIFF or PETITIONER**

v.

**Case Number:** 144476

Robert Oldham Jr.

**Defendant or Respondent**

### PROOF OF SERVICE

_____,

I hereby certify that on April 29 , 20 08, I served a copy
of the attached Petition For a Writ of Habeas Corpus , by placing a copy in
a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope
in the United States Mail at P.O. Box 3030, Susanville, Ca. 96127

I declare under penalty of perjury that the foregoing is true and correct.

Robert Oldham



Robert Oldham F06175
High Desert State Prison C-5 121
P.O. Box 3030
Susanville, Ca 96127/3030

RECEIVED
MAY 1 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

STATE PRISO

Confidential
Legal mail

UNITED STATES POSTAL SERVICE TM
www.usps.gov

LABEL 107R, OCT 1997

United States District Court
for the

Northern District of California

450 Golden Gate Avenue, Box 36060
San Francisco, Ca 94102