1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9               FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  ROBERT OLDHAM, JR,                    No C 08-2340 VRW (PR)

12              Petitioner,
                                          ORDER DENYING PETITION FOR WRIT
13          v                             OF HABEAS CORPUS

14  TOM FELKER, Warden,

15              Respondent.

16  _____/

17

18          Robert Oldham seeks a writ of habeas corpus under 28 USC

19  Section 2254, which, for the reasons that follow, the court denies.

20

21                                  I

22          On April 5, 2004, an information filed in Alameda County

23  superior court charged petitioner with first degree murder in

24  violation of California Penal Code Section 187(a) and possession of

25  a firearm by a felon in violation of California Penal Code Section

26  12021(a)(1).  Attached to the murder charge was an allegation that

27  petitioner had personally and intentionally discharged a firearm,

28  causing great bodily injury or death in violation of California

Penal Code Sections 12022.5(a)(1), 12022.53(b), (c) and (d).  The information also alleged that petitioner had suffered one prior felony conviction.  Doc #11, Ex 1 at 101-03.

On September 30, 2005, a jury found petitioner guilty on both counts and found true the firearm allegation.  Doc #11, Ex 1 at 386, 388-89.

On December 1, 2005, the trial court sentenced petitioner to fifty years to life in prison, consisting of twenty-five years to life for first degree murder and twenty-five years to life for the personal and intentional discharge of a firearm causing death.  The court stayed a two-year term for possession of a firearm by a felon. Doc #11, Ex 1 at 409-11.

On September 17, 2007, the California court of appeal affirmed the judgment.  Doc #11, Ex 6.  On that same date, the court also denied petitioner's request for state habeas relief on claims of ineffective assistance of counsel and cumulative error.  Doc #11, Ex 6 at 44.

On December 19, 2007, the Supreme Court of California denied review.  Doc #11, Ex 8.

On May 6, 2008, petitioner filed a federal petition for writ of habeas corpus under 28 USC Section 2254.  Doc #1.  On July 21, 2008, the court found that the petition stated cognizable claims for relief and ordered respondent to show cause why a writ of habeas corpus should not be granted.  Doc #6.  Respondent has filed an answer and petitioner has filed a traverse.  Doc ## 10, 13.

//

//

//

2

**United States District Court**
For the Northern District of California

II

The California court of appeal summarized the factual background of the case as follows:

> A.   The People's Case in Chief.
>
> Jackson was 33 years old when he died on December 4, 2002.  Before his death, Jackson had been in a homosexual relationship with Derrick Miller, who was 35 years old at the time of trial in 2005.
>
> In early December 2002, Jackson and Miller had from time-to-time been living together in the back bedroom of Berna Blake's apartment.  Her apartment was on the third and top floor of an apartment building in Oakland located on the corner of 25th and Telegraph Avenues.  Berna Blake had known Jackson for about three years.
>
> Another homosexual man, Parish Blake, was also staying at Berna Blake's apartment in December 2002.  Parish Blake had often seen defendant hanging out near Berna Blake's apartment.  He knew defendant by sight, and he also knew defendant's voice.  He testified that defendant had harassed him because of his sexual orientation, which on one occasion prompted him to tussle with defendant.  Parish had also seen defendant and five other people jump Jackson about five days before Jackson's death.  Defendant hit and stomped on Jackson.  The attack lasted four or five minutes.
>
> Miller testified that he had seen defendant near Berna Blake's apartment nearly every day.  He, too, knew defendant's voice.  Defendant and his frequent companion, Donte Lewis, often verbally harassed Miller and Jackson about their homosexuality.  For example, about two or three weeks before Jackson's death, Miller saw defendant and Lewis come toward Jackson after he had left Berna Blake's apartment.  Miller ran over to Jackson and urged him to continue on his way, but defendant and Lewis started to mock Miller, repeating whatever he said to Jackson.  One of them asked Jackson, "Is that your bitch?"  Miller testified that he feared for Jackson's safety because of the repeated altercations Jackson had with defendant and Lewis.  Miller thought defendant and Lewis sometimes waited for Jackson to come out of the apartment just to

**United States District Court**
For the Northern District of California

antagonize Jackson.  Miller testified he had
once seen defendant with a gun in his waistband.
Another time he saw defendant running down the
street with a gun in his hand.

Berna Blake often saw defendant near her
apartment, at times daily.  A couple of weeks
before Jackson's death, Jackson had been upset
and was crying after a conversation with
defendant.  Jackson told Berna Blake that he was
tired of going out because every time Jackson
went out, defendant and Lewis had something to
say to him.

Three times during the year before Jackson's
death, Berna Blake had seen defendant with a
small gun.  In one incident, she saw defendant
pull a gun on someone behind her apartment
building; in another, she saw defendant shooting
at someone he did not want in the area.

At about 6:00 pm on December 4, 2002, Miller
returned home from his job as a landscape
gardener.  He was wearing the kneepads that he
wore for his work.  Defendant was standing by
the front door of the apartment building with at
least five other people.  As Miller passed
defendant, defendant called out, in a sarcastic
tone, "Look at that nigga.  He got on kneepads."
Miller sarcastically replied, "It's called a
job, something you know nothing about."
Defendant's response was, "What you say?  I'll
beat your ass."  Miller laughed and kept walking
to Berna Blake's apartment because he did not
think defendant could "whoop" him.

Defendant, a female friend of his, and another
man followed Miller up to Berna Blake's
apartment.  Berna Blake stopped them at the door
and told them to leave.  Defendant told her that
Miller was not going to disrespect him.
Defendant tried to push past Berna Blake and
reach into the apartment to hit Miller, but she
blocked him with a bar.  At this point, Jackson
started saying to Berna Blake that she should
let defendant and Miller fight.  Miller started
swinging toward defendant, and Berna moved out
of the way because she "was in the middle of the
swinging * * * [and she] didn't want to get
hit."  Miller started fighting with defendant in
the hallway.

No weapons were used during the fight.  While
Jackson, Berna Blake, and at least two other
people looked on, Miller grabbed defendant's

4

dreadlocks and banged his head against the
floor, getting the best of defendant.  Defendant
could not fight back because, according to
Miller, "he was whooped."  Miller got up off of
him.  Jackson said, "That's enough," and told
Miller to go inside Berna Blake's apartment to
wash the blood off his hands.  Defendant got up,
holding his head.  Defendant wanted to keep
fighting, but Jackson told Miller, "No, go in
there and wash your hands.  You already whooped
him.  You have nothing to prove to nobody."
Defendant and the others left.

After the fight, Miller's hand was bleeding, so
he went into the bathroom with Jackson to wash
off the blood.  Berna Blake went to a nearby
store to get some bandages for Miller's hand.
Before she left, she told Miller and Jackson not
to let anyone into the apartment.

Lewis, a friend of defendant's, testified that
he saw defendant leave the apartment building
after his fight with Miller.  Oakland Police
Sergeant Mark Dunakin later testified that when
he interviewed Lewis, Lewis said that defendant
had told Lewis that "the faggot dude grabbed my
hair, dragged me, and had me on the ground."
Lewis could not recall telling this to the
police.

After defendant left the apartment building,
Lewis saw him go toward a nearby red building
and return holding a small pistol.  Lewis had
seen defendant with a gun once before.  Lewis
later saw defendant go back into the apartment
building with a "chrome .25" in his hand.  After
Lewis heard gunshots, he saw defendant come out
of the apartment building.  Lewis denied being
present when these gunshots were fired.

Miller testified that five or ten minutes after
Berna Blake had left the apartment to buy
bandages, he heard a knock at the door.  Jackson
went to answer the door and Miller heard him
start talking to defendant.  Miller was still in
the bathroom at the time, washing the blood off
his hands.  Parish Blake, who was in the
kitchen, also heard Jackson talking to
defendant.  Defendant calmed himself down, asked
to talk to Miller, and told Jackson that he
(defendant) was "not going to fight" Miller.
But Jackson refused to let defendant inside the
apartment.  While talking to defendant,
Jackson's tone of voice was "arrogant and
gloating," and he spoke in a feminine voice.

5

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Miller heard Jackson tell defendant that Miller was in the bathroom.  Defendant told Jackson to tell Miller that Miller was "a mark" and that defendant was going to "get him."  Then Miller heard Lewis say to defendant, "No, Rob."  Defendant responded, "I'm not going to do nothing.  Dre [Jackson] is my partner."  Miller next heard "scuffling" sounds.  Parish Blake, by then in the bedroom, heard the front door bang open.  Miller and Parish Blake then heard at least four gunshots in rapid succession and running footsteps.

Parish Blake saw Jackson run down the apartment's hallway as the shots were fired.  He went to the door and saw defendant holding a gun, which defendant then lowered to his side. Parish Blake then heard Lewis say, "Come on, let's go."  He saw defendant and Lewis go down the stairs.  Parish Blake did not see a gun in Lewis's hand.

Meanwhile, Miller had opened the bathroom door to see Jackson running down the interior hallway.  Jackson fell to the floor, face up. Jackson was gasping and trying to breathe. Miller called 911 and reported that defendant had shot Jackson.  Parish Blake also called 911, but he refused to tell the 911 operator who had shot Jackson for fear of being known as a snitch.

About ten minutes after Berna Blake had left her apartment to go to the store, she saw defendant and Lewis get into a car driven by someone Berna Blake knew as Latoya.  They seemed to be in a hurry.

* * *

B.  The Defense Case in Chief.

* * *

Defendant then testified on his own behalf.  He said that shortly after 5:00 pm on December 4, 2002, he went to Oakland to visit a former foster parent.  There, near the scene of the shooting, he saw Lewis arguing with Miller, whom defendant said he did not know at the time. Miller was accusing Lewis of having been involved in robbing Miller's friend.  As they argued, defendant stepped between Miller and Lewis and pushed them back to separate them. Miller grabbed defendant, and defendant grabbed

6

back.  They both fell to the ground.  Then a man
and a woman came and separated Miller and
defendant.  Miller said something, and Lewis
said, "All right, I'm going to get Q."
Defendant harbored no ill feelings toward Miller
because it was defendant's own fault for having
interfered in something that was not his
business.  Defendant continued on his way to his
former foster parent's home.

On December 23, 2002, after returning to Oakland
to visit his former foster parent, defendant was
arrested.  Defendant also saw the police bring
Lewis out of the building and put him in a car.

After the police put him in an interrogation
room, defendant agreed to talk to the
investigating officers.  They told defendant
that a number of people had implicated him in a
shooting and asked whether he knew Lewis.  They
played a tape recording in which Lewis said that
he saw defendant go to a red building and come
back with a chrome .25 pistol.  They told
defendant they had taped statements and photo
lineups from several people who had accused
defendant, including Miller and Parish Blake.
They also told defendant that if they took the
tapes to the district attorney, defendant would
go to prison and would not be eligible for
parole until he was 60.  They told defendant
that in prison, larger, stronger prisoners would
assault and rape him.  However, they said they
had helped someone from his old neighborhood,
Spud, get his murder charges dropped and said
they could help defendant too.

Defendant testified the investigating officers
suggested to him a scenario where Lewis fired
the shots and then turned the gun on defendant
because defendant was a witness.  According to
their scenario, Lewis then dropped the gun,
defendant recovered it, and by doing so,
defendant prevented Lewis from taking another
innocent life.  They also suggested that when
defendant picked up the gun, it accidentally
went off a few times, "justify[ing] the shots,"
and then Lewis wrestled the gun away from
defendant and ran away.  If defendant would
adopt this scenario, they said, they could get
defendant's case dropped.  Otherwise, they would
take the tapes they had obtained to the district
attorney.  They left defendant alone to think
about their proposal.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

According to defendant, [Oakland Police Sergeant Derwin] Longmire returned to the interrogation room a few minutes later, put on a pair of gloves, and asked, "So, you don't know.  You still don't know nothing, huh?" Defendant shook his head no.  Longmire said, "You think you['re] cool, huh?" Longmire then punched defendant in the head and he fell to the floor.  Everything went blank.  When defendant woke up, Longmire said, "That should refresh your memory."

Seconds later, Dunakin came into the room to ask if defendant was alright.  Defendant said he needed some ice because he had been hit in the head.  Dunakin said he would get some. Defendant said he then started bleeding so profusely that he began to get dizzy, to panic, and finally to black out.  Defendant testified that he did not remember any suicide attempt. After awhile, paramedics arrived and took him to a hospital.

When defendant was brought back to the Oakland Police Department, the investigating officers allowed defendant to see his girlfriend Keisha, but they would not allow him to talk to her until he gave them the statement they wanted. They told him that he could walk out with his girlfriend right then if he would place Lewis at the scene of the shooting, and they again went over the story they wanted defendant to parrot. Defendant gave another taped statement, but Longmire and Dunakin said it was not enough They told defendant, "Give us Tay."  Defendant started to cry.  The officers told him his girlfriend was waiting outside, and took him to where he could see her, but not speak to her. Finally, when asked whether he was ready to go home, defendant said yes.  Defendant then gave a taped statement consistent with what the officers had suggested.

Defendant testified he did not shoot Jackson and denied ever even holding a firearm of any kind. He denied knowing Miller, Parish Blake, or Berna Blake at all.  He said the first time he met Miller was when he tried to break up the altercation between Miller and Lewis on the street.  He also denied meeting Jackson before the day of the shooting and denied being on the third floor of Berna Blake's apartment building when the shooting occurred.

8

C.  The People's Case in Rebuttal.

On rebuttal, Sergeant Longmire denied ever punching defendant and Sergeant Dunakin denied ever seeing Longmire strike defendant.  Dunakin also denied ever telling defendant that he was looking at many years in prison and denied ever asking defendant about the prospect of being raped in prison.  Dunakin denied ever urging defendant to incriminate Lewis, explaining he had already obtained a warrant for defendant's arrest whereas he considered Lewis only to be a witness in the case.

Doc #11, Ex 6 at 2-6, 10-13 (footnotes omitted).

III

A federal court may not grant a writ of habeas corpus on any claim adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 USC § 2254(d).

"Contrary to" requires a finding that the state court's conclusion of law is opposite Supreme Court precedent or the state court's decision differs from Supreme Court precedent on a set of materially indistinguishable facts.  See Williams v Taylor, 529 US 362, 412-13 (2000).  A state court "unreasonably appli[es]" federal law if it identifies the correct governing legal principle from Supreme Court precedent, "but unreasonably applies that principle to the facts of the prisoner's case."  Id at 413.  A federal habeas court making the "unreasonable application" inquiry should ask

**9**

United States District Court

For the Northern District of California

1   whether the state court's application of clearly established federal

2   law was "objectively unreasonable."   Id at 409.

3         The only definitive source of clearly established federal

4   law under 28 USC Section 2254(d) is in the holdings, as opposed to

5   the dicta, of the Supreme Court as of the time of the state court

6   decision.  <u>Williams</u>, 529 US at 412; <u>Clark v Murphy</u>, 331 F3d 1062,

7   1069 (9th Cir 2003), cert denied, 540 US 968 (2003).  While circuit

8   law may be "persuasive authority" for purposes of determining

9   whether a state court decision is an unreasonable application of

10  Supreme Court precedent, only the Supreme Court's holdings are

11  binding on the state courts and only those holdings need be

12  "reasonably" applied.  <u>Clark</u>, 331 F3d at 1069.

13

14                              IV

15        Petitioner seeks habeas relief under 28 USC Section 2254

16  based on three claims:  (1) he was denied his rights to due process,

17  to remain silent and to counsel by the admission into evidence of

18  his pretrial statements; (2) he was denied due process and his right

19  to a jury trial by the testimony of a bailiff; (3) his conviction

20  for first degree murder is not supported by sufficient evidence.

21

22                               A

23        Petitioner claims that the trial court erred by admitting

24  his pretrial statements because those statements were coerced and

25  procured after an involuntary waiver of his rights under <u>Miranda v</u>

26  <u>Arizona</u>, 384 US 436 (1966).

27  //

28

                               10

1

The California court of appeal provided the following
background for this particular claim:

> On August 9, 2005, defendant filed a motion in
> limine seeking to exclude his pretrial
> statements to the police on <u>Miranda</u> and
> involuntariness grounds.  A hearing on the
> motion was held on August 17 and 18, 2005,
> during which the court received the following
> testimony and evidence:  On December 23, 2002,
> defendant was arrested and questioned regarding
> Jackson's death; defendant was 20 years old at
> the time.  Before this arrest, he had been
> arrested three to five times for drug offenses,
> including as a juvenile.  When defendant was
> arrested on October 1, 2001 for possession of
> narcotics for sale, he was advised of his
> <u>Miranda</u> rights, said he understood those rights,
> and after initially stating he would speak with
> the interviewing officer, invoked his right to
> silence.
>
> * * *
>
> The first portion of defendant's interview with
> police lasted from 4:03 pm to 5:45 pm.  At 4:03
> pm, investigating officers Dunakin and Longmire
> introduced themselves to defendant and began to
> fill out the biographical portion of their
> standard statement form with defendant's
> assistance.  During the interview, defendant was
> not handcuffed.  Neither Dunakin nor Longmire
> had his gun with him, and they were both dressed
> in plain clothes.  They were the only officers
> in the interview room.  Dunakin told defendant
> that he wanted to discuss a murder that had
> occurred in early December.  At this point in
> the interview, Dunakin read defendant the
> <u>Miranda</u> advisements printed on the statement
> form.  After Dunakin asked defendant if he
> understood his <u>Miranda</u> rights, defendant
> answered, "Yes."  Dunakin then asked if, having
> these rights in mind, defendant would like to
> talk to the investigating officers, and
> defendant responded, "Yes.  No problem."
> Dunakin recorded defendant's responses on the
> form and defendant initialed his responses.
>
> * * *
>
> The initial portion of the interview was not
> taped.  During this portion, defendant said that

United States District Court
For the Northern District of California

on the date of Jackson's death, he was in San Francisco with his girlfriend, Keisha.  He said he had never been to the area of Berna Blake's apartment.  He said he had seen Donte Lewis around, but did not know Miller, Parish Blake or Berna Blake.  Defendant denied having gotten into a fight with anyone on December 4, 2002, or at any other time that month.

Dunakin then told defendant he had tapes from witnesses who said defendant had been to the area of Berna Blake's apartment and that defendant had been involved in a homicide there.  Defendant did not change his story and continued to deny any involvement.  Dunakin brought Lewis to the door of the interview room so defendant could see him, but defendant continued to deny knowing Lewis.  At 5:45 pm, the investigating officers left the interview room, allowing defendant to remain unhandcuffed.   By that time, defendant had become "jittery" and nervous; he was pacing back and forth when the officers left the room.  Dunakin testified that the more they confronted defendant with information regarding the case, the more nervous defendant became.  However, when Dunakin left the room, he had no concern about defendant's safety or well-being.

At about 6:05 pm, the officers heard a thump, as if someone had fallen.  They entered the interview room to check on defendant and found him on his back.  Defendant stood up on his own, said he was fine, but said he had lost his balance and had fallen.  Longmire told defendant to sit in the chair and relax.  Defendant looked nervous, but physically fine.  He was seated and not handcuffed when the officers again left the room.

Through the interview room door, defendant then asked Dunakin for some water and some ice for his head.  As Dunakin was getting these for defendant, he heard some banging and what sounded like chairs being moved around.  Dunakin looked through the peephole in the interview room's door to see defendant walking in circles very quickly.  He seemed "really excited" like he was "starting to freak out."  Looking through the peephole again, Dunakin saw something around defendant's neck.  Dunakin then pushed the door open and saw there was a shoelace around defendant's neck, the other end of which was tied to the doorknob.  The lace came from one of defendant's shoes.  Dunakin

United States District Court
For the Northern District of California

took the shoelace off the doorknob, and Longmire
untied the lace from around defendant's neck.
Longmire tried to calm defendant, saying,
"Breathe.  This isn't the way to handle this."

Dunakin called for an ambulance.  * * *  The
ambulance arrived quickly and transported
defendant to Highland Hospital.

* * *

After defendant was cleared at Highland
Hospital, he was transported very early on
December 24, 2002 to John George Psychiatric
Pavilion where he spoke with medical staff for
about a half hour.  He was then cleared
medically, which typically involved the
transporting police officer receiving paperwork
stating the inmate was "fit for incarceration."
Defendant was transported to the police
department and placed in the same interview room
at 5:30 am.  The door to the interview room was
left open.  One of the transporting officers
testified he did not observe anything unusual
about defendant's demeanor at that point.  He
did not complain of any physical discomfort, nor
display any abnormal behavior.  Longmire arrived
and checked on defendant's well-being at
6:12 am.

At 6:59 am, Dunakin and Longmire returned to the
interview room.  Dunakin readvised defendant of
his <u>Miranda</u> rights, verbatim, asked him if he
understood the rights, and asked if, having his
rights in mind, defendant wished to talk to him.
Defendant said, "Yes," and initialed a written
waiver form.  Defendant then explained that the
reasons for his apparent suicide attempt were
that he was upset because nobody had come for
his birthday, he felt lonely, and his life was a
mess.  He again denied killing Jackson.  After
the officers had been talking to defendant about
the importance of telling them the truth,
defendant started to become sad and emotional,
though still calm.  He said "he was sorry for
what happened.  He didn't mean for it to
happen."  But then he "pulled back again,"
denying any involvement in Jackson's death.
During this second segment of the interview,
defendant did not complain of any physical
discomfort, nor exhibit any behavior that gave
Dunakin any concern about defendant's
psychiatric well-being.  He also never indicated
to the officers that he wanted to terminate the
interview or that he wanted to invoke his

13

<u>Miranda</u> rights to stop talking with the officers.

At one point during this second portion of the interview, defendant asked to talk with his girlfriend, Keisha. Dunakin telephoned Keisha and asked her to come to the police station. At 8:30 am, defendant saw Keisha during a bathroom break, but the officers did not allow defendant to talk to Keisha at that time. They resumed the interview at 8:35 am.

At another point in the interview, defendant indicated that the "[w]ord on the block" was that Donte Lewis was at the scene of the crime. The officers began asking questions about Lewis's possible involvement. Defendant's answers were responsive and coherent. He did not appear to have any difficulty understanding the questions.

At 9:25 am on December 24, 2002, defendant said in a taped statement that his <u>Miranda</u> rights had been read to him both on the previous night, December 23, as well as on the morning of December 24. He said he had acknowledged those rights and had indicated a willingness to talk to the officers. Defendant then described how he had been feeling alone before he put the shoestring around his neck. When asked whether he had tried to kill himself on his own, he responded that he just "wanted to escape," and that "life is so hard." He said he did not know how he got the cut above his eye, but he said it probably happened when he fell to the floor.

Defendant acknowledged that he had been near the area of Berna Blake's apartment. He said he had told the officers earlier that he was sorry for the shooting, but said he thought it was an accident. He said that he had heard that Lewis had gotten into an altercation, went to get "some protection," then came back and shot someone. Defendant said he had been in San Francisco with Keisha on the day of the shooting. Defendant again denied knowing Jackson, Parish Blake, or Berna Blake, as well as ever having been on the third floor of the apartment building where Jackson was shot. The taped interview concluded at 9:46 am, when the officers took a break, leaving defendant unhandcuffed in the interview room.

From 9:57 am to 11:24 am, the officers checked on defendant periodically, at times finding him

14

asleep, and at other times giving him food.  At
11:25, the officers resumed the interview, but
did not tape it.  During this portion of the
interview, defendant started talking about what
he had heard, about specifics involving Lewis,
and about a fight Lewis was in which defendant
had observed.

From 12:16 pm to 12:26 pm, the officers
conducted a second taped interview.  On this
tape, defendant again confirmed that, on both
December 23 and 24, Dunakin had read defendant
his <u>Miranda</u> rights, and defendant had
acknowledged those rights and agreed to speak
with the investigating officers.  Defendant then
described a fight between Lewis and someone
outside of the apartment building where Jackson
was shot.  Defendant said he verbally tried to
break this fight up by trying to help them come
to a compromise.  He said the man Lewis fought
with talked as though he were homosexual.  He
said he saw Lewis go get a gun afterwards.
Lewis and defendant then went to the top of a
building where Lewis knocked on a door.  Lewis
invited the person who answered the door and
that person's friend to come outside.  Lewis
wanted to fight the friend and wanted defendant
to fight the other person.  However, defendant
next heard Lewis fire a shot and defendant
turned and ran out of the building

After this second taped interview, the officers
started to leave the interview room to take a
break, but defendant grabbed Dunakin's leg and
asked him not to leave.  Defendant said "I
didn't mean to do it.  It just started going
off.  Can't remember what kind it was."  He
started sobbing and said something to the effect
of, "Accidentally happened.  Shot four times."

The officers then made a third, and final, tape
from 12:39 pm to 12:50 pm.  Again, defendant
acknowledged having had his <u>Miranda</u> rights read
to him on December 23 and 24, having
acknowledged those rights, and having agreed to
talk to the officers.  Longmire asked defendant
to pick up with the "true version" of what
happened when defendant and Lewis were on the
third floor of the apartment building.
Defendant said Lewis was trying to get someone
to come out of the apartment, but that person
refused.  Defendant "heard a pop."  He and Lewis
ran toward each other, and Lewis dropped
something.  Defendant picked it up.  It was a
gun.  Defendant did not aim the gun, but tried

United States District Court
For the Northern District of California

to avoid shooting himself while he ran.
Defendant and Lewis were still near the doorway
of the apartment where the person had been shot.
Defendant said the gun "just kept bouncing" in
his hand and went off about four times, though
he could not be sure of the exact number because
it all "happened so fast."  Defendant did not
see the man who was shot.  After the shots,
defendant gave the gun to Lewis and then left.

Defendant told the officers he at first claimed
not to have any first-hand knowledge of
Jackson's shooting because he "didn't know [the
officers] had good intentions."  Defendant
explained it was "difficult" for him to talk
about the shooting because "look what happened.
[¶] * * *  Someone died for nothing."

Defendant agreed on the tape that during their
interviews the officers had not been abusive,
and specifically that they did not hit him or
"throw [him] down."  Defendant explained the
reason he had tried to hang himself the night
before was he "was thinking, 'man, [I] can't say
good-bye to my mother, my girl or * * * I never
see nobody again.  I'll just never get to * * *
say, "I'm sorry."'"

From 1:58 pm to 2:20 pm, the officers allowed
defendant's girlfriend Keisha to visit with
defendant in the interview room.  Defendant was
then taken to jail.  Dunakin testified during
the hearing that he did not make any promises to
the defendant during the interviews "about being
able to see Keisha, if he, for example,
cooperated with [the officers], or gave [them] a
true version of what happened."  Dunakin agreed
that defendant brought up his desire to talk
with Keisha several times during the interviews.
Each time, his response was something to the
effect of, "We will try to make those
accommodations later."  Dunakin said the
officers "told him that we would allow him to
speak with Keisha if the opportunity presented
itself afterwards or when it was appropriate.
But there was no promise that he was going to
speak to her."  The officers ultimately allowed
defendant to speak with Keisha because "it was
Christmas Eve, and we were done speaking with"
defendant.

Dunakin also testified that throughout the
investigating officers' interviews of defendant,
he appeared to understand their questions and
his answers were responsive and coherent.

16

United States District Court

For the Northern District of California

1
2
3
4
5

> Defendant never showed any unwillingness to
> speak to them.  Dunakin testified neither he nor
> Longmire ever used any physical force on
> defendant, nor did they make any threats toward
> defendant or anyone else.  They made no threats
> regarding penalty, punishment, or the district
> attorney's involvement in the case, and no
> promises of leniency.  Dunakin testified he
> never raised his voice or yelled at defendant.

6   Doc #11, Ex 6 at 24-26, 27-31.

7          The California court of appeal found no error in the trial

8   court's admission of petitioner's pretrial statements.  The court

9   found petitioner knowingly and intelligently waived his <u>Miranda</u>

10  rights despite his suicide attempt or any mental illness. Doc #11,

11  Ex 6 at 33-36.  The court found the suicide attempt could not be

12  asserted as an invocation of petitioner's right to silence as a

13  suspect must unambiguously assert his right to silence once that

14  right has been waived.  Id at 34.  Finally, the court dismissed

15  petitioner's claim of police coercion because the promise, if one

16  existed, did not proximately cause petitioner's pretrial statements.

17  Id at 36-37, (quoting <u>People v Benson</u>, 52 Cal3d 754, 778 (1990)).

18

19                                    2

20          Involuntary confessions are inadmissible under the

21  Fourteenth Amendment.  <u>Blackburn v Alabama</u>, 361 US 199, 206-07

22  (1960).  "The test is whether, considering the totality of the

23  circumstances, the government obtained the statement by physical or

24  psychological coercion or by improper inducement so that the

25  suspect's will was overborne."  <u>United States v Leon Guerrero</u>, 847

26  F2d 1363, 1366 (9th Cir 1988) (citing <u>Haynes v Washington</u>, 373 US

27  503, 513-14 (1963)).

28

United States District Court
For the Northern District of California

1    To obtain federal collateral relief for the erroneous

2 admission of an involuntary confession, petitioner also must show

3 that the error was not harmless.  Fulminante v Arizona, 499 US 279,

4 306-12 (1991).  In other words, habeas relief is appropriate only if

5 the coerced confession had a "'substantial and injurious effect or

6 influence in determining the jury's verdict.'"  Pope v Zenon, 69 F3d

7 1018, 1025 (9th Cir 1995) (quoting Brecht v Abrahamson, 507 US 619,

8 637 (1993)).

9    Similarly, to obtain federal collateral relief for the

10 erroneous admission of statements obtained in violation of Miranda,

11 petitioner must show that the error in admitting the statements was

12 not harmless.  Jackson v Giurbino, 364 F3d 1002, 1010 (9th Cir 2004)

13 (quoting Calderon v Coleman, 525 US 141, 147 (1998)).

14

15                                    3

16    For the purposes of this petition, the court assumes,

17 without deciding, that constitutional error occurred when the trial

18 court admitted petitioner's pretrial statements.  The court finds,

19 however, that any such error could not have had a substantial and

20 injurious effect or influence in determining the jury's verdict that

21 petitioner was guilty of first degree murder.  Thus, petitioner's

22 claim for collateral relief on the grounds that admission of his

23 pretrial statements violated his rights to due process, to remain

24 silent and to counsel, fails.

25    Petitioner does not identify which of his trial statements

26 were erroneously admitted as well as how their admission had a

27 substantial and injurious effect or influence in determining the

28 jury's verdict.  Nonetheless, the court examines the possible effect

18

United States District Court
For the Northern District of California

or influence petitioner's pretrial statements could have had on the jury's verdict.

The jury was instructed with California Criminal Jury Instruction Number 8.20 as follows:  "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder in the first degree * * * ."  Doc #11, Ex 1, Vol 2 at 323.  Because the jury instructions are not challenged by petitioner, the court examines the "effect or influence" each of petitioner's statements could have had on the jury's first degree murder verdict.

The portion of petitioner's interview that occurred from 4:03 pm to 5:45 pm on December 23rd, 2002 consisted of:  (i) a potential alibi for the day of the shooting; (ii) a denial of ever being near Berna Blake's apartment; (iii) a denial of knowing Lewis, Miller, Parish Blake or Berna Blake; and (iv) a denial of having engaged another man in a fight on December 4, 2002.  Doc #11, Ex 6 at 25.

None of the statements in this portion of the interview could have contributed to the jury's verdict of first degree murder; they neither prove petitioner perpetrated the crime nor do they prove "any kind of willful, deliberate and premeditated killing with express malice aforethought."  CALJIC No 8.20.  Because these statements are not probative of the elements of the crime, they could not have had a substantial and injurious effect or influence on the jury's verdict.

The portion of petitioner's interview that started at 6:59 am on December 24 followed petitioner's attempted suicide and subsequent medical clearance.  Doc #11, Ex 6 at 26-27.  That portion

**United States District Court**
For the Northern District of California

of petitioner's interview consisted of an explanation for his
attempted suicide and a denial that he killed Jackson.  Id at 27.

Petitioner's attempted suicide may be probative of
consciousness of guilt.  Because a showing of consciousness of guilt
is probative of guilt (see, for example, <u>People v Osslo</u>, 50 Cal2d
75, 93 (Cal 1958)), petitioner's statement could have had an
injurious effect or influence on the jury's verdict under CALJIC No
8.20 if it were the only evidence of petitioner's suicide attempt.
But, the jury heard evidence of petitioner's suicide attempt through
the eyewitness testimony of the interrogating officers.  See Doc
#11, Ex 2, Vol 5 at 985-94 & Vol 6 at 1243-47.  In this regard,
petitioner's statements regarding his suicide attempt were
cumulative and, thus, could not have had a substantial effect or
influence on the jury's verdict.  Further, to the extent
petitioner's statements included an explanation for his suicide
attempt, they could not have had an injurious effect or influence on
the jury's verdict because they offered a frame-of-mind other than
consciousness of guilt.

The portion of petitioner's interview that started at
8:35 am consisted of a hearsay statement accusing Lewis of Jackson's
murder.  Doc #11, Ex 6 at 28.  This statement could not have had an
injurious effect or influence on the jury's decision to convict
petitioner of first degree murder because it provided an alternative
perpetrator for Jackson's murder.  The statement did not provide any
basis for the jury to find petitioner guilty of first degree murder
as instructed under California Criminal Jury Instruction No 8.20.

The portion of petitioner's interview that started at
9:25 am consisted of:  (i) another explanation for his suicide

20

United States District Court
For the Northern District of California

attempt; (ii) acknowledgment that he had been near Berna Blake's apartment; (iii) a reaffirmation of his alibi; (iv) a further denial of knowing Jackson, Parish Blake or Berna Blake; (v) a repeat of the hearsay statement accusing Lewis of the murder; and (vi) another hearsay statement that the shooting was an accident.  Doc #11, Ex 6 at 28-29.

None of these statements could have contributed to the jury's verdict of first degree murder.  As noted earlier, the explanation for petitioner's suicide attempt is cumulative to the officers' eyewitness testimony.  See Doc #11, Ex 2, Vol 5 at 985-94 & Vol 6 at 1243-47.  Also, statements regarding petitioner's alibi, his denial of knowing Jackson, Parish Blake or Berna Blake and the hearsay statements could not have had an injurious effect or influence on the jury's verdict because they neither incriminated petitioner as the perpetrator of the crime nor provided evidence of premeditation.  See CALJIC No 8.20.  Further, petitioner's statement that he had been in or around Berna Blake's apartment was provided by the eyewitness testimony of Parish Blake, Berna Blake and Miller.  See, for example, Doc #11, Ex 2, Vol 3 at 502-04 [testimony of Parish Blake] & Vol 4 at 862-67 [testimony of Berna Blake].  Thus, this statement also was cumulative, and as such, could not have had a substantial effect or influence on the jury's verdict.

The portion of petitioner's interview that started at 12:16 pm consisted of a story that begins with Lewis fighting another male outside the apartment building where Jackson was shot.  Doc #11, Ex 6 at 29.  Petitioner stated that he had attempted to stop the fight by seeking a compromise between the men.  Petitioner clarified that Lewis's opponent "talked as though he were

United States District Court
For the Northern District of California

homosexual." Petitioner stated that Lewis retrieved a gun and then petitioner accompanied Lewis to an apartment. Petitioner stated that Lewis invited the person who answered the door and his friend to come outside. Petitioner stated that Lewis intended for petitioner to fight the person who answered the door, while Lewis would fight the friend. Petitioner stated that he heard Lewis fire a shot and then petitioner ran out of the building. Id.

The first segment of petitioner's statement here, involving petitioner seeking a compromise for a fight between Lewis and a homosexual male, was consistent with petitioner's own testimony. Doc #11, Ex 6 at 10-11. Because petitioner testified at trial to the same facts in this segment of his pretrial statement, the admission of that segment could not have had a substantial and injurious effect or influence on the jury's verdict.

The second segment, involving Lewis retrieving a gun and then petitioner accompanying Lewis to an apartment where shots were subsequently fired, could not have had a substantial and injurious effect or influence on the jury's verdict. Evidence placing petitioner and Lewis at the scene of the crime was amply provided by eyewitness testimony from Miller and Parish Blake. Doc #11, Ex 6 at 5-6. In addition, Berna Blake testified that she witnessed petitioner and Lewis hastily leaving the area of the apartment building shortly after Jackson's shooting. Id at 6. This segment of petitioner's pretrial statements is also cumulative and, thus, could not have had a substantial effect or influence on the jury's verdict. Moreover, petitioner's statements not only provided an explanation for the eyewitness testimony that placed him at the scene of the crime but also, if believed, exonerated him because it

identified Lewis as the perpetrator.  As such, it could not have had an injurious effect or influence on the jury's verdict.

Following this portion of the interview, petitioner added to the officers that he "didn't mean to do it.  It just started going off.  [He couldn't] remember what kind it was."  Doc #11, Ex 6 at 8, 29.  Petitioner then started sobbing and said something to the effect of "Accidentally happened.  Shot four times."  Id.  This statement is repeated in the final portion of petitioner's interview, which is analyzed below.

The final portion of petitioner's interview started at 12:39 am and consisted of another story beginning with Lewis trying to get someone out of an apartment on the building's third floor. Doc #11, Ex 6 at 29-30.  Petitioner stated that he heard a "pop" and then Lewis and petitioner ran toward each other.  Petitioner stated Lewis dropped something and then petitioner picked it up. Petitioner stated it was a gun and he tried to give the gun back to Lewis.  Petitioner stated that he did not aim the gun, but tried to avoid shooting himself while he ran.  Petitioner stated the gun "kept bouncing" in his hand and went off about four times, though he could not be sure of the exact number.  Petitioner stated that after the shots were fired, he gave the gun back to Lewis.  Petitioner stated that he did not see the man who was shot.  Petitioner added that he had, at first, claimed not to have any first-hand knowledge of the incident because he "didn't know [the officers] had good intentions."  Id at 30.

To the extent that this portion of petitioner's statement placed him at the scene of the crime, as noted earlier, eyewitness testimony provided by Miller, Parish Blake and Berna Blake likewise

23

United States District Court

For the Northern District of California

placed petitioner at the scene of the crime.  As such, Petitioner's
statement could not have had a substantial effect or influence on
the jury's verdict.  Moreover, this portion of petitioner's pretrial
statements explains the incriminating eyewitness testimony of Parish
Blake which places petitioner at the scene of the crime with a gun
in his hand immediately after the gun shots were fired.  Because
this portion of petitioner's pretrial statements, if believed by the
jury, was exculpatory, it could not have had an injurious effect or
influence on the jury's verdict.

Taking into account the effect or influence each of
petitioner's pretrial statements could have had on the jury's
verdict, the court cannot say that, assuming the admission of those
statements was error, the error had a substantial and injurious
effect or influence on the jury's verdict.  <u>Brecht</u>, 507 US at 637.

B

Petitioner claims that he was denied due process or his
right to a jury trial because the trial court permitted the bailiff
to testify.

1

The California court of appeal provided the following
background for petitioner's claim:

> Near the end of defendant's trial, the court met
> with defendant and counsel outside the presence
> of the jury after being informed that the
> courtroom bailiff had observed suspicious
> behavior by the defendant while he was being
> brought to the courthouse. * * *  The trial
> court ruled that the bailiff could testify
> [regarding defendant's behavior], but would no

United States District Court
For the Northern District of California

1

> longer be permitted to act as a bailiff at this
> trial.

2

3

> [The bailiff, Ed Ortman] testified that he was
> also assigned to handle transportation of
> inmates from the jail at Santa Rita to the
> courthouse in Oakland; that earlier that
> morning, Ortman had transported a busload of
> inmates from Santa Rita to the courthouse; and
> that defendant was one of the inmates on the
> bus, as was Miller, who had already testified as
> a prosecution witness in the case.  Before the
> bus left Santa Rita, Ortman saw defendant pass a
> folded piece of paper to an inmate named
> English, who was in an adjacent compartment of
> the bus, and in the same compartment as Miller.
> After English looked at the paper, he passed it
> back to defendant.

4

5

6

7

8

9

10

> Ortman removed Miller from the bus to assure his
> safety.  As Ortman did so, defendant told
> English, "That's him."  When Ortman arrived at
> the courthouse, he obtained the paper from
> defendant and provided it to the trial court.
> The paper was a copy of a witness list.  On the
> list, an arrow and a word [D_E] were written
> next to Miller's name.

11

12

13

14

15

> * * *

16

> Defendant then testified that he did pass a copy
> of the witness list in this case to English.
> But he said he did so only because English had
> asked what kind of evidence the People had
> against defendant, and to show English that it
> was "just a witness case, it's a hearsay thing."
> He told English that the real perpetrator was
> Lewis, whose name was highlighted on the list.
> Defendant said he had drawn arrows on the
> witness list next to the names of Miller and two
> other witnesses to indicate to his attorney that
> they were in custody and should be examined
> carefully.

17

18

19

20

21

22

23

Doc #11, Ex 6 at 37-38.

24

        The California court of appeal found no error in allowing

25

the bailiff to testify.  Doc #11, Ex 6 at 38.  The court

26

distinguished the two cases relied upon by petitioner, <u>Turner v</u>

27

<u>Louisana</u> and <u>Gonzales v Beto</u>, on three grounds:  (i) the bailiff

28

here was not a "key" or "crucial" prosecution witness; (ii) the

bailiff here ceased associating with the jury after offering his testimony; and (iii) there was very little evidence on the record of the extent and intensity of the bailiff's association with the jury. Id at 40, (citing <u>Turner</u>, 379 US 466 (1965); <u>Gonzales</u>, 405 US 1052 (1972)).

2

Permitting a bailiff to testify as a witness in a criminal trial can violate a defendant's Fourteenth Amendment right to trial by an impartial jury.  See <u>Turner</u>, 379 US at 473-74 (applying a presumption of prejudice in a murder trial in which two deputy sheriffs provided critical testimony relating to the defendant's guilt and enjoyed "a continuous and intimate association" with the jury thought the trial); <u>Gonzales</u>, 405 US at 1055 (Stewart, J, concurring) (noting that the <u>Turner</u> presumption is concerned with "crucial witnesses against the defendant who associated with the jurors as their official guardians throughout the trial").

Evidence of improper communications between a bailiff and the jury is not necessary to invoke <u>Turner</u>'s presumption of prejudice.  <u>Turner</u>, 379 US at 473.  The presumption of prejudice, however, is premised on a meaningful role for the bailiff's testimony in the case against the defendant.  See Id at 473 ("It is to be emphasized that the [bailiff's] testimony * * * was not confined to some uncontroverted or merely formal aspect of the case for the prosecution.  On the contrary, the credibility which the jury attached to the testimony of these two key witnesses must inevitably have determined whether [the defendant] was to be sent to his death."); <u>Cooper v Calderon</u>, 255 F3d 1104, 1113 (9th Cir 2001).

**3**

Because the California court of appeal has correctly identified the governing legal principle, the court can only grant collateral relief under this claim if the state court unreasonably applied the principle to the facts of petitioner's case. <u>Williams</u>, 529 US at 413.

Petitioner relies upon <u>Turner</u> and <u>Gonzales</u> for the proposition that the bailiff's testimony was prejudicial. In those cases, the credibility of each bailiff was crucial to the case against the defendant. <u>Turner</u>, 379 US at 473 ("[T]he credibility which the jury attached to the testimony of these two key witnesses must inevitably have determined whether [the defendant] was to be sent to his death.'); <u>Gonzales</u>, 405 US 1053 (Stewart, J, concurring) ("[T]he case * * * turned so largely on [the jury's] assessment of the [bailiff's] credibility.") See also <u>Cooper</u>, 255 F3d at 1113. In both <u>Turner</u> and <u>Gonzales</u>, the defendant challenged the credibility of the bailiff's testimony. <u>Turner</u>, 379 US at 473; <u>Gonzales</u>, 405 US 1053 n 1 (Stewart, J, concurring).

Here, petitioner does not challenge the credibility of the bailiff's testimony. Nor could he without calling into question his own credibility, because petitioner's testimony of the bus incident was consistent with that of the bailiff. Doc #11, Ex 6 at 37-38. Not only did petitioner fail to present the jury with a reason to doubt the credibility of the bailiff's testimony, petitioner removed the question of the bailiff's credibility by providing corroborating testimony. The bailiff's credibility, therefore, played no role in the prosecution's case against petitioner.

United States District Court
For the Northern District of California

Because the credibility of the bailiff did not play a crucial role in petitioner's trial, <u>Turner</u>'s presumption of prejudice does not apply to the bailiff's testimony here. Accordingly, the court finds that the California court of appeal's application of <u>Turner</u> and <u>Gonzales</u> to the facts of petitioner's case was not unreasonable.  <u>Williams</u>, 529 US at 413.

C

Petitioner claims that his conviction for first degree murder is not supported by sufficient evidence.  In particular, petitioner offers the following two-part argument: (i) evidence of premeditation toward a third party, Miller, is not admissible to show premeditation and deliberation on the actual victim, Jackson; and (ii) when the evidence of premeditation toward Miller is removed from the analysis, the evidence to show premeditation and deliberation with respect to Jackson is insufficient.

1

The California court of appeal rejected the first part of petitioner's argument, i e, that evidence of petitioner's premeditation toward Miller was inadmissible as evidence of premeditation and deliberation toward Jackson.  The court explained that "[i]t was not improper for the prosecutor to ask the jury to consider the evidence regarding defendant's apparent preparations to shoot Miller.  * * * [Petitioner's] 'killing state of mind' before he confronted Jackson at the apartment's door was 'a background fact to be considered as to whether or not premeditation [or deliberation] as to the actual victim took place.'"  Doc #11, Ex 6

at 19-20, (quoting trial transcript) (last alteration in original).
The court also rejected the second part of petitioner's argument,
i e, that there was insufficient evidence to show premeditation and
deliberation with respect to Jackson.  Id at 21-24.


2

A state court's evidentiary ruling is not subject to
federal habeas review unless the ruling violates federal law, either
by infringing upon a specific federal constitutional or statutory
provision or by depriving the defendant of the fundamentally fair
trial guaranteed by due process.  See <u>Pulley v Harris</u>, 465 US 37, 41
(1984); <u>Jammal v Van de Kamp</u>, 926 F2d 918, 919-20 (9th Cir 1991);
<u>Middleton v Cupp</u>, 768 F2d 1083, 1085 (9th Cir 1985), cert denied,
478 US 1021 (1986).


3

Petitioner offers no basis in federal law to question the
California court of appeal's finding that the evidence that
petitioner had premeditated the intended killing of Miller could be
used by the jury to find premeditation in the killing of the actual
victim, Jackson.  Absent assertion of a constitutional or statutory
violation, the court has no jurisdiction to engage in collateral
review of the state court's evidentiary ruling.  See <u>Pulley</u>, 465 US
at 41.  Thus, the court must assess this particular claim under the
assumption that the first premise of petitioner's argument fails.

Because the court's acceptance of the first premise of
petitioner's argument is a precondition to the court reaching the
second premise, the claim fails in its entirety.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1                                    V

2          For the foregoing reasons, the petition for a writ of

3    habeas corpus is DENIED.

4          The clerk shall enter judgment in favor of respondent and

5    close the file.

6

7          IT IS SO ORDERED.

8

9

10

11    _____

12    VAUGHN R WALKER
      United States District Chief Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    G:\PRO-SE\VRW\HC.08\Oldham-08-2340-petition denied.wpd

28